**ISHMAIL MUSLIM ALI (Formerly ISHMAEL S. La BEET),**
**Petitioner**

v.

**WINSTON GIBSON, Commissioner of Public Safety, Respondent**
**UNITED STATES BUREAU OF PRISONS, Intervenor**

Civil No. 76-535

District Court of the Virgin Islands

Div. of St. Thomas and St. John

December 28, 1979

---

428

430

GEORGE M. ALEXIS, ESQ., Federal Public Defender, St. Thomas, V.I., *for petitioner*

IVE ARLINGTON SWAN, ESQ., Attorney General of the Virgin Islands, JULIO A. BRADY, ESQ. (By Special Appointment of Counsel), Department of Law, St. Thomas, V.I., *for respondent*

ISHMAEL A. MEYERS, ESQ., United States Attorney, by HENRY E. DAVIS, ESQ., Attorney (Department of Justice), St. Thomas, V.I., *for intervenor*

CHRISTIAN, *Chief Judge*

OPINION

INTRODUCTION

On September 6, 1972, in broad daylight, a group of armed, masked men virtually invaded the clubhouse of the Fountain Valley Golf Course. After having robbed guests and employees alike, they indiscriminately opened fire on their defenseless victims, killing eight persons and wounding several others.

Some days later, five men were arrested and charged with the crimes. They have come to be known as the "Fountain Valley Five" and their trial, as the celebrated "Fountain Valley Case".

Jury selection for a trial panel commenced on June 20, 1973, and was concluded on June 30, 1973, when a panel of twelve jurors and six alternates was impanelled and sworn. What proved to be by far the most tempestuous of criminal trials in the Caribbean area commenced on July 5, 1973.

Each of the five defendants was charged with eight counts of first degree murder, two counts of robbery and four counts of assault in the first degree, i.e., with intent to commit murder. The trial, marked with a profusion of vile and vituperative epithets hurled at the trial judge day after day, ended on August 5, 1973, when the case was handed to the jury for deliberation. On August 13th, the

432

jury returned unanimous verdicts as required by law, finding each of the five defendants guilty as charged.

Sentence was imposed on the same day. Each defendant was sentenced to the mandatory term of life imprisonment on each of the eight counts of murder in the first degree. The trial judge ordered that the life sentences be served consecutively. A sentence of 15 years' imprisonment on each of the remaining six counts was imposed on the several defendants. Those six fifteen-year terms of imprisonment were ordered to be served concurrently with each other and concurrently with the sentence of life imprisonment imposed on Count 1 of the information.

On the very day of sentencing, the defendants were flown to the Commonwealth of Puerto Rico in the custody of United States Marshals.[1] They remained incarcerated in Puerto Rico until on or about September 6, 1973, at which time they were transported to the United States penitentiary at Atlanta, Georgia. They were taken to that facility and delivered to its warden by the United States Marshal for the District of Puerto Rico. Subsequently, they were sent to separate federal institutions. Four of the five have continued in federal custody ever since. One of them remained in custody at Atlanta, Georgia, until on or about March 21, 1977, when he was transferred to the federal penitentiary at Marion, Illinois. That member of the so-called "Fountain Valley Five", formerly Ishmael La Beet, now by virtue of a change of name, Ishmail Muslim Ali, filed a pro se petition in this Court challenging the validity of his detention in federal custody and seeking other relief on numerous grounds. It is that proceeding, now on remand from the United States Court of Appeals for the

---

[1] Because tension was high, and to accomplish this movement of the prisoners undetected, the Marshals resorted to the ruse of having a decoy van leave the courthouse, supposedly with the prisoners on their way back to the detention center, as usual, and then secretly in another van transporting the prisoners to waiting Antilles Airboats at the seaplane ramp.

Third Circuit, which is the subject of this Court's present concern.

The pro se petition of Ishmail Muslim Ali (hereafter sometimes Ali or petitioner) was filed in the District Court in the Division of St. Thomas and St. John on September 3, 1976. As is so often the case with pro se handwritten pleadings, the precise relief sought was not readily discernable. Because of the petitioner's reference to 28 U.S.C. § 2241, the federal habeas corpus section, the petition was treated as an application for a writ of habeas corpus.

Named as respondent was Winston Gibson, then Commissioner of Public Safety for the Virgin Islands.[2]

In his petition, Ali charged that he was suffering cruel and unusual punishment by virtue of the conditions under which he was incarcerated at Atlanta.[3] Further supplementing his cruel and unusual punishment claim, Ali averred that incarceration at Atlanta was so far removed geographically from his homeland that family visits were rendered virtually impossible. Moreover, he went on to say, on the occasions when members of his family were able to visit him they were subjected to extreme harassment by prison officials and were not accorded the courtesy of the families of other inmates. Numerous subsidiary grounds for relief were pleaded[4] and to the extent that they merit discussion, will be treated later on in this opinion.

Another form of relief principally sought by Ali was injunctive. He prayed in his petition for an order transferring him back to the Virgin Islands for the service of

---

[2] At the time Ali's petition was filed, and for years prior thereto, the Commissioner of Public Safety for the Virgin Islands was the penal authority. Since January 1, 1978, care, custody and maintenance of prisons and prisoners is a function of Virgin Islands Bureau of Corrections.

[3] Among the offending conditions listed were: (a) overcrowding of prisoners; (b) racial tension among inmates and between inmates and guards; (c) rampant drug availability; (d) the prevalence of homosexual assaults and actual rapes; (e) brutality meted out by prison guards; (f) general cruelty to prisoners.

[4] E.g., that his transfer was not authorized by Virgin Islands law.

his sentence, and that his further transfer be enjoined. In essence, he alleged that his incarceration in federal custody was unlawful since it was not authorized by the laws of the Virgin Islands. His basic contention in this regard was that respondent could lawfully transfer prisoners only where doing so would "serve the best interest of the inmate". Since his life was in danger and further because he contends he was incarcerated under unusual, and inhuman circumstances, his best interest was being disserved and his return to the Virgin Islands was mandated. As a basis on which petitioner should be transferred to the Virgin Islands, this contention is wholly without merit.[5]

This Court, on motion of respondent, entered an Order the 4th day of November 1976 dismissing Ali's petition. In so ruling, we relied on the then well-established teaching of Ruiz v. United States, 5 V.I. 116, 365 F.2d 500 (3d Cir. 1966). We reasoned that since Ali had been convicted of criminal offenses under the Code of the Virgin Islands, he was ineligible for relief under 28 U.S.C. § 2241. We went on to point out that while the Virgin Islands Code indeed provided for habeas corpus relief at 5 V.I.C. § 1301 et seq., the District Court lacked jurisdiction to entertain the habeas corpus application of a petitioner

. . . confined at the federal facility at Atlanta, Georgia, regardless of the merits of the application. . . . 365 F.2d at 502.

Subsequently, petitioner moved the Court for reconsideration of its decision but that motion was denied by Order entered March 2, 1977.

Ali appealed to the United States Court of Appeals for the Third Circuit. That Court applying the "Braden" rule[6] reversed our decision, holding in effect that the District

---

[5] Petitioner's argument overlooks the fact that the Commissioner was charged to consider not only the interest of the inmate, but the welfare of the territory as well.

[6] Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973).

Court of the Virgin Islands and, indeed, only the District Court of the Virgin Islands, had jurisdiction to entertain this petitioner's habeas corpus application. The Appellate Court ruled that jurisdiction hinged on the presence of the person of the custodian within the territory of the forum.[7] Proceedings on remand having been had and briefs of all parties[8] having been submitted, we now address the prime issues raised.

## I

Why, and on what authority, or by whose orders, petitioner was removed from the Virgin Islands was in hot dispute at the hearing. Absolutely uncontroverted, however, is the fact that immediately after sentence had been imposed, petitioner and his co-defendants were ferreted out of St. Croix and to the District of Puerto Rico.[9]

The removal of petitioner from this district was accomplished without the prior approval, or even the knowledge, of his lawful custodian, the Commissioner of Public Safety. That official was made aware after the fact, although just when he was advised is not clear.

Testifying regarding the authority on which the prisoners reached their mainland destination, the federal facility at Atlanta, Georgia, the then Commissioner of Public Safety, Alphonso A. Christian, Esq., gave a version of the occurrence in which, while admitting that his recollection was not clear because of lapse of time, he claimed to have authorized United States Deputy Marshal Krim Ballentine

---

[7] "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." Title 5 V.I.C. § 1301. "The writ shall be directed to the person having custody of, or restraining the person on whose behalf the application is made, and shall command him to have the body of such person before the court . . . ." Title 5 V.I.C. § 1305.

[8] The United States Department of Justice was granted leave to intervene on behalf of its Bureau of Prisons.

[9] Further findings in this respect, upon our consideration of the evidence, will be detailed below.

to remove the petitioner and his co-defendants to a federal facility immediately upon their conviction, in the event that was the result of their trial. The former Commissioner stated that he made the decision to incarcerate these prisoners outside of the Virgin Islands because of their tumultuous behavior while in custody prior to trial. He plainly undertook to make out a case for a disciplinary transfer. He went on to state that it was his opinion that none of the facilities under his control were suitable to house these uncontrollable prisoners who, he insisted, had vandalized every institution in which they had been kept in the Virgin Islands and had done nothing but foment trouble and discord within the inmate population.

Called to the stand to testify, the now Chief Deputy Marshal Ballentine gave quite a different account. He denied ever having conferred or agreed with Commissioner Christian to remove the prisoners upon their conviction to a federal facility. He went on to state that he was totally unaware of how they were transported to Atlanta, on whose order it had been done, and by whom it was accomplished. Ballentine said that at the time of the conviction of petitioner, he (Ballentine) was then in St. Louis, Missouri, but that Deputy Marshal Paul Underwood, who was next to him in command, had called to advise him of the conviction and of his plan to take the prisoners to Puerto Rico. Underwood confirmed Ballentine's position and explained that he had determined to take the prisoners out of the Virgin Islands if convicted because his intelligence officer had disclosed to him that there was strong likelihood of vigilante action against the defendants if they were acquitted or if their sentences were not sufficiently severe. He stated also that the same source advised him that there was also the possibility of some action on the part of the supporters of the "Fountain Valley Five" to rescue the group from their custodians in the event they were con-

victed and sentenced. It was for these reasons, Underwood stated, he had taken the prisoners to Puerto Rico. Like Ballentine, Underwood insisted that once the prisoners arrived at Puerto Rico they considered their custodial functions at an end and played absolutely no part in the decision to "ship out" the five men to Atlanta. Like Ballentine, Underwood confessed total unawareness of the transfer to federal custody. Because the former Commissioner admitted that there might have been some erosion of his memory on this matter because of passage of time, and further because the Marshals were in by far the better position to say how, when and why the prisoners were taken to Puerto Rico, I accept as my finding the version of the United States Marshals.

■ Our finding above stated means, then, that the plain and unambiguous order of the Court in its Judgment and Commitment was violated.[10] The Judgment and Commitment of petitioner commanded that

. . . he is hereby committed to the custody of the Commissioner of Public Safety, or his authorized representatives, . . . .

The authorized representative of the Commissioner of Public Safety of the Virgin Islands could be only his assistant or one of his deputies or his warden or any police officer that he may have put in charge of his various institutions. Under no circumstances could a member of the United States Marshal Service be deemed an "authorized representative" of the Commissioner of Public Safety. More especially would this be true of the United States Marshal for the District of Puerto Rico. It is clear, therefore, that petitioner was, in effect, "shanghaied" out of this territory and into federal physical custody entirely without

---

[10] While the Deputy United States Marshals are to be commended for having exercised what was probably sound judgment, their decision, however wisely motivated, cannot be accorded this Court's stamp of approval. By eliminating the Commissioner of Public Safety, as they testified they did, they completely overstepped their bounds, even assuming the Commissioner was empowered to have authorized the move.

any order, direction, or authority from any official of the Government of the Virgin Islands.

The movement of petitioner to the mainland was the culmination of other doings concerning petitioner and his fellow prisoners for which this Court can find no warrant in law, whatsoever. This end result was readily predictable given the confusion surrounding the preconviction custody of these defendants.

Title 3 V.I.C. § 257 states in pertinent part

(a) The Department of Public Safety shall exercise general control over the enforcement of the laws relating to public safety and shall—

. . .

 (4) administer jails, prisons, and detention houses;

Thus our statutory law recognized and adopted the historical fact of life that care, custody, and detention of prisoners is a function of the executive branch of government. Notwithstanding the unambiguous provisions of § 257, the trial court entered orders dated the 12th and 14th of May 1973 which in effect extracted the "Fountain Valley Five" from the entire prison population and custody of the Commissioner of Public Safety as ordained by law and delivered them to the care, custody and maintenance of the United States Marshal for the District of the Virgin Islands.[11]

█ We leave to one side and do not discuss, but simply question, the authority of the U.S. Marshal Service to have accepted this charge. Whatever active support this move may have obtained from the national capital or elsewhere, nowhere in the mission of the U.S. Marshal Service do we find that that service is commissioned to fulfill the function

---

[11] The Orders of the Court placed the accused in the custody of the United States Marshal for the Virgin Islands. The testimony of Deputy Marshal Ballentine left no doubt that he was in actual charge of the prisoners and that he consulted, or failed to consult, the Marshal of this district as he (Ballentine) saw fit. The removal of the prisoners to Puerto Rico was a case in point.

it did in this instance. Indeed, Chief Deputy Marshal Ballentine admitted as much in his testimony. Counsel for respondent, in his post-trial brief, was moved to say that

. . . respondent concedes that the Court orders of May 12th and 14th, 1973 were somewhat unusual. . . .

We, however, cannot so casually slough off the matter. We must either find a legal basis for the transfer of custody or conclude that it was not lawful.

Again respondent is quick to point out and rely heavily on a consideration that we deemed totally irrelevant. Says respondent

. . . the only parties who might legitimately challenge [those orders] the Government of the Virgin Islands and the petitioner himself chose not to do so. . . .

This fact is of absolutely no moment. The Legislature of the Virgin Islands having decreed that the Commissioner of Public Safety shall be the custodian of prisoners spoke with the voice that all must obey until the same source instructs otherwise. However expedient, no matter how propitious or necessary to the proper detention of defendants it may have been, the orders emanated from the wrong font of power. The means cannot be justified by the end achieved, be that end ever so laudable. This Court, now faced with the reality of legal determination, must "call a spade a spade". The transfer of petitioner from the custody of the Commissioner of Public Safety, the lawfully constituted authority, to the care of the U.S. Marshal Service was an exercise of power not given to the Court.[12]

---

[12] Our abiding conviction in this conclusion notwithstanding, we in truth do not really fault the trial judge. Embattled as he was by the verbal abuse of the defendants, the judge simply had to insure the proper and expeditious conduct of the trial. The presence of the accuseds was a must if the trial were not to be infected with reversible error. Given our sad experiences with public safety over the years the judge likely felt he had no other recourse. From the cooperation accorded him, there is no doubt that the United States Department of Justice felt impelled to join and support the trial court in this decision. Absent the Marshals, one cannot conceive of the trial having been conducted.

Thus commenced a consecution of events on which this Court must now pass judgment. This movement of petitioner from the custody of the Commissioner of Public Safety to the U.S. Marshal for the District of the Virgin Islands, the trans-shipment of petitioner from St. Croix to the Commonwealth of Puerto Rico and his delivery to the custody of the U.S. Marshal for the District of Puerto Rico cannot be justified under the laws of the Virgin Islands. They are initial links in the entire unusual chain that stretches beyond Puerto Rico to Atlanta, Georgia, and elsewhere.

## II

Respondent insists that he had authorized the transfer of the prisoners. This, of course, is contrary to the finding hereinabove entered by this Court. Assuming arguendo, however, that the Commissioner of Public Safety had in fact ordered petitioner's transfer to federal custody, we examine the then existing law of the Virgin Islands to determine if the Commissioner of Public Safety could have lawfully so directed.

Evidently, the question of the propriety of transfer of Virgin Islands prisoners to federal institutions on the mainland has been with us for quite some time. It appears that some time during the year 1947, the then Government Secretary[13] of the Virgin Islands, The Honorable Morris F. DeCastro, inquired of the Office of the United States Attorney[14] whether or not the government was authorized to transfer a Virgin Islands prisoner to a federal institution. The Acting United States Attorney, at the time, answered the query as follows:

---

[13] Government Secretary was formerly the title in the Virgin Islands of the official, one of whose functions was that of a Lieutenant Governor, the present designation.

[14] In former times United States Attorney was legal advisor to the Executive Branch of the Government of the Virgin Islands. This was before the advent of the Department of Law of the Virgin Islands, headed by the Attorney General of the Virgin Islands.

441

It is the opinion of this office that, in the absence of local legislation conferring power on some official to transfer prisoners, it would be necessary to obtain some sort of consent from the prisoners themselves if the possibility of legal complication is to be minimized. For such a worthy purpose, however, I believe that legislation could be obtained with reasonable dispatch.

The response of the United States Attorney seemed to have laid the matter to rest. However, when under the authority of the 1954 Organic Act the laws of the Virgin Islands were being codified, the codifiers introduced § 4501 of Title 5 of the Virgin Islands Code. As enacted in 1957, this section read,

Persons convicted of offenses against the government of the Virgin Islands shall be committed, for such terms of imprisonment as the court may direct, to the custody of the Commissioner of Public Safety or his authorized representative, who shall designate the places of confinement where the sentences shall be served.

The Commissioner of Public Safety may designate any available, suitable, and appropriate institutions. He may order any inmate transferred from one institution to another.

So worded, this section was in force in 1973 when petitioner was allegedly ordered transferred to the Federal Bureau of Prisons.

As the revision note indicates § 4501 was lifted almost verbatim from portions of § 4082 of Title 18 of the United States Code. Commissioner of Public Safety was substituted for Attorney General of the United States and government of the Virgin Islands for the federal government. As we shall see, however, these were crucial omissions. It is this section that is claimed as authority for the transfer of a prisoner from the Territory to the mainland by the Commissioner of Public Safety. Reliance is placed on the following portion of the section:

The Commissioner of Public Safety may designate any available, suitable, and appropriate institutions. He may order any inmate transferred from one institution to another.

442

■ It is clear to this Court that the last sentence of the section, as above quoted, can have reference only to institutions within the Virgin Islands. In the first place, to order that an inmate be incarcerated in a particular institution, the person giving the order must necessarily have control of the institution to which the inmate is being ordered. Certainly no one would argue that the Commissioner of Public Safety of the Virgin Islands exercises any such control over federal correctional facilities. Secondly, under the well-settled rule of statutory construction which this Court has repeatedly and properly applied, our § 4501 is to be construed as the federal § 4082 was construed by the federal government and in the federal courts as of the time we adopted the section. See James v. Henry, 157 F.Supp. 226, 3 V.I. 273, 276 (D.V.I. 1957); Williams v. Dowling, 318 F.2d 642, 4 V.I. 465, 469 (3d Cir. 1963); Government of the Virgin Islands v. Carr, 451 F.2d 652, 8 V.I. 435, 443 (3d Cir. 1971). The federal section, as copied, was uniformly construed as authorizing the Attorney General of the United States to transfer federal prisoners from one federal institution to another federal institution. For the transfer of a federal prisoner from a federal institution to a state institution, additional statutory authority was needed.[15] Accordingly, we conclude that § 4501, as it existed in August of 1973, did not empower the Commissioner of Public Safety to transfer a Virgin Islands prisoner from an institution in the Virgin Islands to a federal facility. In short, no statute of the Virgin Islands, at the pertinent time, authorized such a transfer.[16]

---

[15] See 18 U.S.C. § 4002. Moreover, a portion of 18 U.S.C. § 4082, which our codifiers did not adopt, authorized the Attorney General of the United States to place federal prisoners in suitable and appropriate institutions "... *whether maintained by the Federal Government or otherwise*. . . ." (Emphasis supplied.)

[16] The writer must confess, perhaps, primary guilt with respect to the practice he now condemns (i.e., transferring Virgin Islands prisoners to federal institutions). While United States Attorney, the writer initiated the negotiations which resulted in the then Director of the Federal Bureau

A subsequent legislative enactment of the Virgin Islands Legislature bolsters this Court's conclusion that statutory authority for a transfer was lacking at the time of petitioner's trans-shipment to the mainland.

Perhaps because it realized the long-standing practice of sending Virgin Islands prisoners to Federal Bureau of Corrections for incarceration was without lawful authority, and doubtlessly aware that there would be repercussions over such a transfer in as celebrated a case as "Fountain Valley", the Legislature on August 27, 1973, amended § 4501 by adding a paragraph saying

[t]he Commissioner is also authorized to use the facilities of the U.S. Bureau of Prisons in accordance with agreement between the Virgin Islands and the U.S. Department of Justice when the Commissioner determines that detention and/or correctional facilities within the Virgin Islands are inadequate to serve the best interest of the inmate or the general welfare of the territory.

Moreover, at a later time, a new chapter 401 of Title 5 was enacted establishing our Bureau of Corrections and transferring the penal authority from the Department of Public Safety to the newly created Bureau. When so doing, the Legislature at § 4502(e) of Title 5 defined "institution" to mean "a prison, penitentiary, jail, workhouse, training school, or other facility operated by the Government of the Virgin Islands for the correction of offenders". While it is true that these clarifying enactments followed the passage of the original § 4501, under appropriate canons of statutory construction these later enactments may be relied upon in determining the true import of the prior statute. In this conclusion we are sustained by what we deem to be sound principle, and legal authority, as well.

 The suggestion has been advanced that the subsequent amendment to § 4501 served the purpose of dis-

---

of Prisons agreeing to accept and hold selected prisoners. Moreover, as a judge he recommended such transfers on repeated occasions prior to the August 27, 1973, amendment to § 4501.

pelling doubt that as previously worded that section authorized the transfer of territorial prisoners to federal custody. See Gereau v. Henderson, 526 F.2d 889, 892, n.2 (5th Cir. 1976). We simply cannot agree, for the notion runs counter to the well-settled rule

> . . . that an amendment making a material change in the phraseology of a statute is ordinarily viewed as showing an intention on the part of the Legislature to change the meaning of the provision rather than interpret it. Twin Lock, Incorporated v. Superior Court, 344 P.2d 788, 792 (Sup. Ct. Cal. 1959).

To the same effect is our own circuit.

> It is a canon of statutory construction that where as here the words of a later statute differ from those of a previous one on the same or a related subject, the Legislature must have intended them to have a different meaning. Klein v. Republic Steel Corporation, 435 F.2d 762 (3d Cir. 1970).

And the Court of Appeals for the Second Circuit has followed suit saying,

> . . . an amendment to an existing statute is indicative of a legislative intent to change existing law. United States v. Berger, 338 F.2d 485 (2d Cir. 1964).

Statutory amendments are usually intended to alter the law. We believe this to have been the case with the August 27, 1973, amendment to § 4501.

 On all the foregoing we come to the conclusion that even if, as the former Commissioner of Public Safety testified, he had authorized the U.S. Marshal to remove petitioner from the Virgin Islands and deliver him to the Federal Bureau of Prisons immediately upon conviction, such an order being without the consent of the petitioner and not bottomed on any lawful statutory authority would have been invalid.[17]

---

[17] We emphasize, and cannot too strongly stress, that our conclusion that petitioner's transfer to federal custody was unlawful is not intended to, as it could not possibly, put in doubt, to any degree, the validity of his trial and conviction. Who fed petitioner during trial, transported him back and

# III

■■ That the exercise of penal authority is the function of the executive branch of the government is a proposition of general acceptance. Further, that it is no part of the business of the Court to interfere with the exercise of that authority, absent constitutional violations by the executive, is undisputed.

. . . the well established reluctance of the Federal Courts to intervene in internal affairs of state or Federal penal institutions. Regulations for the administration and discipline of prisons, promulgated and enforced by duly authorized officials, are not subject to review by the courts unless it can be clearly demonstrated that they interfere with fundamental rights guaranteed by the Constitution.

This proposition is soundly based on the fact that prison administration is a function of the executive branch of the Government and one for which the courts, with their limited experience and facilities, are ill-suited to undertake. Johnson v. Avery, 382 F.2d 353, 355 (6th Cir. 1967), reversed on other grounds 393 U.S. 483 (1969).

Traditionally, federal courts have adopted a broad hands-off attitude towards problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. More require expertise, comprehensive

---

forth, and ultimately delivered him to the Atlanta Federal Penitentiary has nothing to do with his trial and casts no shadow whatsoever on the verdicts of the jury. The conviction has withstood the test of all avenues of appeal.

planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities. (Footnotes omitted.) Procunier v. Martinez, 416 U.S. 396, 404–05 (1974).

* * *

But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights. 416 U.S. at 405–06.[18]

It follows, therefore, that in the normal course of events this Court lacks the power to direct that the Bureau of Corrections incarcerate petitioner in a correctional institution in the Virgin Islands as he asks us to do. This is not to say, however, that we may not insist that proper and adequate procedures and guidelines be established by the Bureau of Corrections to insure the uniform and constitutionally acceptable treatment of inmates.

In establishing the Bureau of Corrections of the Virgin Islands, effective January 1 of 1978, the Legislature provided § 4503(g) of Title 5.

The Director is authorized to use the facilities of the U.S. Bureau of Prisons in accordance with agreement between the Virgin Islands and the Department of Justice when the Commissioner (sic)[19] determines that detention and/or correctional facilities within the Virgin Islands are inadequate to serve the best interests of the inmate or the general welfare of the Territory.

---

[18] The above passages from Procunier v. Martinez we quoted with approval in Barnes v. Government of the Virgin Islands, 13 V.I. 122 (D.V.I. 1976).

[19] It is clear that Director rather than Commissioner was intended. The word Commissioner was used more than likely because the section was copied from a jurisdiction in which the head of the Bureau of Corrections is called the Commissioner of Corrections.

This is as it should be. The Director of the Bureau of Corrections should be free to make the judgment of what serves the best interest of the inmate or the welfare of the Virgin Islands. The expertise for making that judgment lies with the Director and this is the situation as it exists in the federal system as well as each of the fifty states of the United States.

 Notwithstanding that by universal acknowledgment the administration and regulation of correctional facilities is properly assigned to the executive branch of the government, the Legislature of the Virgin Islands, against the advice of this Court, for reasons which this Court has tried to discern but has never been able to fathom, amended § 4503(g) by Act No. 4087, passed January 11, 1978, and approved by the Chief Executive of the Virgin Islands on January 26, 1978, by substituting the words "sentencing authority" for the word "Commissioner". Thus, as matters now stand and as they have stood since January 26 of 1978, the Director of the Bureau of Corrections has lost the power to transfer a prisoner from a Virgin Islands institution to a federal facility. He may do so only when the sentencing judge makes the determination of what will best serve the interests of the inmate or the general welfare of the Territory. Consequently, any person transferred to the Federal Bureau of Prisons since January of 1978 solely on the Order of the Director of the Bureau of Corrections has been unlawfully transferred. It follows, of course, that insofar as this petitioner is concerned, no one in the Virgin Islands presently has the power to transfer him to a mainland facility. The Director of the Bureau of Corrections lacks the authority. Likewise, the judge, the "sentencing authority", is similarly powerless, for more than 120 days have expired since sentence was imposed or a final judgment on appeal rendered. Therefore, until some action is taken by the Legislature of the

448

Virgin Islands, the fact is that petitioner must be allowed to serve his sentence in the Virgin Islands.[20]

## IV

Always at the heart of the petition of Ishmail Muslim Ali is the contention that his incarceration in the custody of the Federal Bureau of Prisons, by virtue of existing conditions, constitutes cruel and unusual punishment in violation of the 8th Amendment of the Constitution of the United States, made applicable to this Territory by the Revised Organic Act of the Virgin Islands, as amended; and that as a consequence thereof, his return to the Virgin Islands into the physical custody of the Bureau of Corrections should be ordered.

A superabundance of testimony was adduced on Ali's behalf in his effort to support his 8th Amendment contention.[21] Most of that testimony was from the mouths of fellow inmates. As might be expected, when tested in the crucible of cross-examination and measured against standards of reasonableness, much of it can be characterized as prison scuttlebutt and cell block yarns. As to none of the several bases on which the 8th Amendment violations were grounded can it be said that petitioner prevailed by a preponderance of the evidence. However, because the evidence and all the circumstances surrounding Ali's confinements suggest that the allegations, while failing to satisfy the standard of proof required, are not wholly unfounded, and further, because constructively, at least, a territorial prisoner lawfully and properly confined in a federal institution remains in the custody of the Bureau of Corrections, the latter being responsible to the prisoner as well as to this

---

[20] If this Court's judgment in this regard is correct, the proponent or proponents of Act No. 4087 should come forward and explain the compelling concerns which motivated the encasement of the Director in such a strait jacket. We continue to believe this to be an intolerable (for the Bureau of Corrections) situation, one which should be promptly rectified.

[21] About two dozen witnesses testified on behalf of petitioner, thirteen of them by deposition.

Court for the prisoner's physical and constitutional well-being, a critical analysis of the situation presented is warranted. Of the rights petitioner unsuccessfully contends were violated on his claims of cruel and unusual punishment, the following will be discussed in detail: (1) a prisoner's right not to be treated differently, such as by being placed in solitary confinement, solely because of the gravity of the crime for which he was convicted; (2) a prisoner's right to protection by prison officials from physical attack by other prisoners; (3) a prisoner's rights to visitation by his family and to communication with friends and relatives; and (4) a prisoner's rights to due process protections enunciated in Bono v. Saxbe, 450 F.Supp. 934 (E.D. Ill. 1978). Before proceeding, it must once again be emphasized that the discussion which follows does not aid petitioner since he has failed to prove violations of the relevant rights. Instead, the Court's analysis is addressed towards indicating to the Bureau of Corrections its various responsibilities and guiding the Bureau in complying with the obligations that flow from these duties.

We can think of no better starting point for these remarks than the knowing and authoritarian words of Mr. Justice White.

There is no Iron Curtain drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. (Citations omitted.) They retain the right of access to the Courts (citations omitted). Prisoners are protected under the equal protection clause from invidious discrimination based on race. Prisoners may also claim the protection of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law (citations omitted). Wolff v. McDonnell, 418 U.S. 539 at 555–6 (1974).

Among the averments of petitioner are the allegations that he has been denied the right to practice his religion; that he is served foods which are forbidden by the dietary

450

dictates of his religion; that he has been arbitrarily and unnecessarily subjected to body cavity searches, and that mind-altering drugs have been forcibly administered to him. As to these contentions, the proof fell far short of the ring of credibility and we find that these accusations have no basis in fact.

The first contention of substance raised by petitioner on his Eighth Amendment claims is his right to treatment equal to that received by other prisoners. As we have seen, petitioner was delivered to the warden of the U.S. Correctional Facility in Atlanta, on or about September 6th or 7th of 1973. He remained incarcerated at that institution until on or about March 21, 1977. For approximately the first seven months at that institution, petitioner was confined in what is termed "administrative segregation", which I take to be a form of solitary confinement. Except perhaps for nine or ten months of petitioner's remaining stay at Atlanta, he was, for various reasons, kept in segregation at these times as a punitive measure.

Upon petitioner's transfer to the penitentiary at Marion, Illinois, he was immediately placed in the so-called "H" Unit. That unit is the division of the Marion "Control Unit" which is utilized for long-term segregation. Petitioner remained in "H" Unit until about the end of October at which time he was placed in the "Control" section used for short-term segregation referred to commonly as unit "I". It will be readily appreciated therefore that for most of petitioner's federal incarceration he was confined in segregation rather than in the general prison population.

The petitioner's confinement in solitary at Atlanta was sometimes for stated infractions, once for becoming involved in a fracas in the mess hall and another time for leaving a work detail to go to the infirmary and arriving at the clinic tardy. While the Court makes no finding as to

451

the reasonableness of the length of the segregation on these occasions, it will not refrain from expressing the belief that the length of time in solitary confinement seemed quite disproportionate to the gravity of the infractions and longer than the period of such confinement of others no less culpable who were likewise involved. Most particularly does this seem to be true when Ali was punished for hanging a blanket over the door of his cell in an effort to protect himself from the cold air blowing into his cell. Apart from these instances of institutional misconduct, petitioner's solitary confinement seems to have been occasioned wholly by an administrative determination that he should be so secluded because of the crimes for which he had been convicted. This would be in accord with the once prevailing policy of the Federal Bureau of Prisons, of designating certain prisoners as "special offenders", again a classification based on the gravity of the crime or the nature of the offense for which a prisoner had been convicted.

█ The practice of designating inmates as "special offenders" and segregating them from the general population on this basis has been soundly and justifiably judicially condemned. See Battick v. Stoneman, 421 F.Supp. 213 (D. Vt. 1976) ; Battle v. Anderson, 376 F.Supp. 402 (D. Ed. Okla. 1974) ; Polizzi v. Sigler, 564 F.2d 792 (7th Cir. 1977) ; reh. denied January 10, 1978; Bono v. Saxbe, 450 F.Supp. 934 (E.D. Ill. 1978). Bowing to the weight of censure from the bench and perhaps because of pricks or the pangs of conscience, the Federal Bureau of Prisons eventually abandoned the practice, resorting thereafter to what it calls a "Central Monitoring Case" System. This Court, therefore, was taken by more than mild surprise to read in the brief submitted by counsel for the Department of Justice that in placing petitioner Ali in segregation immediately upon his arrival at the institutions and leaving him there for prolonged periods, for no cause whatso-

ever, without hearing, and based solely on the crimes for which he had been convicted, the Bureau was properly exercising its discretion. The short of it is that the practice which I have outlined above, however styled, offends the due process clause of the United States Constitution, and in no case should a prisoner be subjected to such confinement except for cause and only after some form of minimal due process hearing. Polizzi v. Sigler; Battle v. Anderson, and Bono v. Saxbe, supra.

■ Admittedly, Polizzi v. Sigler, upon which we rely heavily, principally because it is a decision of a Circuit Court of Appeals, has been criticized. See for example, Smaldone v. United States, 458 F.Supp. 1000, 1006 (D. Kan. 1978). However, we find Polizzi to be well reasoned. It appears to fully represent a current trend and the decision finds support in the American Bar Association's proposed standards relating to the legal status of prisoners as published in 14 American Criminal L. Rev. No. 3, Winter 1977. For our purposes, it matters not that the segregation is designated "administrative". For if the conditions which obtain are in fact punitive, Eighth Amendment concerns may yet be implicated and a form of due process hearing mandated. Battle v. Anderson, supra.

On the subject of segregated confinement as a "special offender", Battick v. Stoneman, supra has particular bearing. In Battick, the designation had been fastened on a Vermont State prisoner who pursuant to a Vermont statute had been properly transferred to a federal institution. The District Court in Battick did not hesitate to decry the practice and, moreover, went so far as to direct the Commissioner of Corrections for the state of Vermont to effect or bring about an appropriate change in the prisoner's status.

■ Commenting further on the long periods in which this petitioner has been kept in solitary confinement, we

would point to Hutto v. Finney, 437 U.S. 678 (1978). At the trial level, a thirty-day limitation had been placed on the length of time a prisoner could be permissibly confined in solitary. The District Court was not only affirmed in this regard by the Circuit Court of Appeals, but its action received the approval of the High Court as well. We acknowledge without hesitation that the conditions prevailing in that Arkansas prison with which the Court in Hutto was confronted were highly offensive as to cell conditions and the daily fare fed to prisoners in isolation. Nonetheless, it must be recognized that we are dealing with matters which differ only in degree. A more extended period might be permitted under less onerous conditions. Whatever the situation, however, this petitioner's plight calls for close scrutiny, if only because of the length of time he was confined in segregated units.

Inasmuch as petitioner is no longer confined under the conditions and circumstances which other courts have condemned, action along the lines taken by those courts is not deemed necessary, at this time. What we have said, however, should serve as instruction to the Virgin Islands Bureau of Corrections, the agency which rightfully has the custody of petitioner even though that custody may be constructive.

Moreover, it fairly appears from the evidence that, at least for some of the time, petitioner was in the "Control Units" at Marion at his own request, or if he did not actively request such confinement, he declined to be placed in the general population. In admitting that this was true, petitioner says that he was motivated to do so by his fear of death, or serious bodily harm at the hands of another inmate if he were placed in the general population. Thus, we reach the second of petitioner's contentions, that the federal prison authorities have not only failed to protect him from vicious attacks from fellow inmates, but also,

454

says Ali, it is common knowledge among the inmate population that there exists a "contract" on his life. If petitioner proved that there was a pervasive threat to his life and physical well-being to the extent that the institution might properly be charged with failure to exercise proper caution for his safe care and custody and, therefore, that petitioner was forced to remain in isolation for extended periods of time for his own safety, we would have no hesitation in finding that a claim for cruel and unusual punishment had been established. In these factual circumstances, however, no such finding is entered.

 Such evidence as was offered to support the allegations that a "contract" is out on the life of petitioner, with the implicit suggestion that it is the federal prison authorities who are offering the so-called "contract", I find to be lacking in credibility. Not that this Court is so naive as to conclude that such contracts are not executed within the walls of federal correctional institutions, for the evidence that this is an ever-present reality is unimpeachable.[22] Nor does this Court for a single moment doubt that the number of persons is considerable for whom the swift and violent demise of petitioner is something greatly desired.[23] But to suggest that the Federal Bureau of Prisons, as an organization, is to be numbered among those who might seek or would be pleased at the prospect of Mr. Ali's murder, is, on the evidence, preposterous and nothing short of a slander on that federal agency. Nonetheless, given the wide mix of the federal prison population, the notoriety given the crimes for which petitioner was convicted, the fact that the incident on which Ali's conviction is based appears to have arrived at Atlanta ahead of him, it is not too farfetched to

---

[22] See generally reported hearings before Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, Ninety-Fifth Congress, August 1 through October 25, 1978.

[23] Numerous letters and telephone calls received by the Court attest to this.

believe that some of the asserted attacks did take place and that individual correction officers either actively sanctioned such doings, or turned a blind eye to them. Nor is it hard to believe that individual inmates or guards may have harbored the thought, or even expressed the hope. The Bureau of Corrections for the Virgin Islands should be fully advised that the failure of prison officials to protect an inmate from attack by other prisoners may give rise to a valid claim of cruel and unusual punishment under the 8th Amendment and a denial of due process or equal protection under the 14th Amendment, as well. Curtis v. Everette, 489 F.2d 516 (3d Cir. 1973), is a case in point. It was there held that a complaint which alleged that prison officials had failed to prevent a violent attack on a prisoner by other inmates properly stated a violation of the due process clause of the 14th Amendment. Similar holdings are found in the Fifth Circuit. Fox v. Sullivan, 539 F.2d 1065 (5th Cir. 1976); Harris v. Chanclor, 537 F.2d 203 (5th Cir. 1976).[24]

 Ali alleged that homosexual attacks are rampant and expressed some fears in this regard. Prison officials have an obligation to inmates in this area also. See McCray v. Sullivan, 509 F.2d 1332 (5th Cir. 1975), cert. denied 423 U.S. 859 (1975). The 8th Circuit has likewise so held. See Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971). The Court of Appeals for the 5th Circuit in particular[25] has gone so far as to express the recognition that prison authorities must provide sufficient guards to assure a constitutional level of inmate safety and has required the presence of not less than two guards in open dormitories at all times. Williams v. Edward, 547 F.2d 1206, 1213 (5th

---

[24] In view of the recently expressed concern of the Legislature of the Virgin Islands, capping this wellspring of additional damage awards merits serious consideration.

[25] The Federal Penitentiary at Atlanta, Georgia, falls within the jurisdiction of the Court of Appeals for the Fifth Circuit.

Cir. 1977). And where there has been a proper showing that inmates are subjected to physical assaults and other abuses by co-inmates, injunctive relief to the extent of ordering that additional guards be hired has been considered. Gates v. Collier, 501 F.2d 1291, 1308 (5th Cir. 1974); James v. Wallace, 406 F.Supp. 318 (D.N.D. Ala. 1976).

We emphasize that we do not refer to the occasional or isolated attack by one prisoner on another. This we take to be an unavoidable day-to-day circumstance which the officials of the prison can hardly be expected to prevent. What we do wish to stress is that a prisoner has a right secured by the Eighth and Fourteenth Amendments of the Constitution of the United States to be reasonably protected from repeated attacks of violence or from the constant threat of such violence at the hands of fellow inmates. And what we do underscore is that a prisoner need not wait until the actual attack has occurred to obtain relief. Our concern will be, as it must, to ascertain whether the risk of harm from other inmates is demonstrably pervasive and if that be the case, whether or not officials are exercising reasonable care to prevent such occurrences.

Although on our appraisal of the evidence presented petitioner has failed to establish his Eighth Amendment claims, he is not altogether in want of that Amendment's protection. Likewise he is beneficiary of favorable due process rulings. The case of Bono v. Saxbe is highly pertinent, certainly in so far as his confinement at Marion is concerned.

Bono v. Saxbe was a class action (Federal Rules of Civil Procedure 23(b)(2)) filed in the United States District Court for the Eastern District of Illinois by one Victor Bono, a prisoner in the "Control Unit" of the Marion Penitentiary. The class was adjudged to be ". . .

457

composed of all inmates currently confined in the Marion Penitentiary Control Unit and all who will be so confined in the future. . . ." 450 F.Supp. at 936.

Petitioner falls squarely within the class. Indeed, he was in the control unit at the time the decision in Bono was rendered. He may therefore properly claim the full benefit of that decision. Many of the practices and conditions which Ali challenged in the instant petition were struck down by the Court in Bono v. Saxbe. Since as a member of the class, he has already received a favorable decision, it follows that should he be returned to Marion, or for that matter to any other federal institution, he may not be confined under the conditions found in Bono to be violative, of his rights secured under the Constitution of the United States.[26] We see no need to detail the findings, conclusions and holdings of Bono but simply refer to the case and adopt them, for as we have stated, to the extent that decision remains viable, this petitioner's prayers with respect to his confinement at Marion, Illinois, have been beneficially answered. We bring this matter to the attention of the Virgin Islands Bureau of Corrections, once again, for its guidance and future administrative determinations.

Finally, we reach another substantial 8th Amendment violation alleged by petitioner. Here, too, the Court encountered another close question of fact. Petitioner averred that he was effectively denied rights of visitation by his family because of geographical distance, the financial hardship caused his family in visiting him, the severe difficulties endured by family members in reaching the institutions once they had arrived at the nearest terminal city, and the harassment of his visitors by personnel of the institution.

---

[26] When this Court last checked the status of Bono v. Saxbe it was advised by the Clerk of the Court of Appeals for the Seventh Circuit that the matter is still pending before that tribunal. Final briefs were to have been submitted during September of 1979.

No argument or discussion is necessary to establish that Atlanta, Georgia, is considerably distant from the Virgin Islands nor would anyone suppose that the correctional facility is located at the heart of that metropolis, or a mere "stone's throw" from the airport serving the City of Atlanta. The Marion Penitentiary is even farther away and much more inaccessible once one arrives at a city that might be viewed as a main transportation hub of the area. Having arrived at such a terminal point, one must brave the discomforts and delays of what was described as a rather tedious bus ride. These facts should be clear to all, for none would presume that the Federal Bureau of Prisons locates its institutions on well beaten paths.

The matter of the expenditure of money involved indeed raises a grave problem. Petitioner was at various times visited by his mother and father, as well as by a brother and sister, as the Court recalls. In each case, however, a substantial outlay of cash was required. Petitioner's mother, who visited him both at Atlanta and Marion, testified that in order to do so she was compelled to sell a piece of property which she owned. The cost to his family of visiting petitioner, then, cannot be a consideration to be taken lightly.

Petitioner's father and his siblings testified as to some difficulties they encountered with prison staff in making their visits. Such problems, as they were, however, must be considered mild, and giving the institution the benefit of the doubt, related to the proper management of a correctional facility. In any event, Mr. La Beet testified that he was always able to visit and communicate with his son in a manner, and under circumstances, he deemed satisfactory. With petitioner's mother, however, it was another story. Her testimony was that she was subjected to gross indignities of such proportion that, if true, can in no way be related to proper prison administration. Her

presence at the institutions, Atlanta, in particular, was announced in terms that, to understate the case, were as demeaning as they were vile. This Court does not for a single moment doubt that the racial slurs addressed to her, of which she complained, were uttered. No good purpose would be served in repeating them here and the Court refrains from so doing. Given the level of training, the intelligence and the racial tolerance characteristic of too large a number of the guards in correctional institutions,[27] much of Mrs. La Beet's testimony has to be credited. We need not go to any length to point out to the Bureau of Corrections that Virgin Islands prisoners and their visiting family and friends are not to be subjected to this type of abuse. Those incarcerated in the Virgin Islands do not experience it, and the obligation of the Bureau of Corrections, if it finds it necessary to incarcerate its prisoners elsewhere, is to see to it that they are treated with no less dignity abroad than at home.[28]

Once again we take the time to inform the Bureau of Corrections that prisoners are not wholly without rights, especially in the area of visits by family members and friends. Prisoners, it has been held, have a constitutional right to communicate with friends and relatives by means of visits. Brenneman v. Madigam, 343 F.Supp. 128 (D.N.D. Ca. 1972). The Supreme Court of the United States has likewise so indicated. See Pell v. Procunier, 417 U.S. 817, 862 (1974). It has also been held that prisoners are entitled to weekly visits. James v. Wallace, 406 F.Supp. 318

---

[27] The unanimous verdict of witnesses who testified at the hearing, prisoners, ex-prisoners and civilians alike, was that too many of the first level officers were relatively uneducated, boorish and manifested racial prejudice. And see generally comments to like effect in "The Shame Of The Prisons" by Bagdikian and Dash (1972) and "Kind & Usual Punishment" by Mitford (1974).

[28] This Court has already instructed the Bureau of Corrections of the standards its regulations on visiting rights must meet. See Barnes v. Government of the Virgin Islands, 13 V.I. 122, 145–6 (D.V.I. 1977). The Bureau cannot escape this responsibility by transferring its prisoners.

(M.D. Ala. 1976). Barnes v. Government of the Virgin Islands, 13 V.I. 122, 145–6 (D.V.I. 1976). Newman v. Alabama, 559 F.2d 283 (5th Cir. 1977) and see Thomas v. Brierly, 481 F.2d 660 (3d Cir. 1973) (where refusal to allow visits on a basis of race was struck down). The Brierly court made clear that denial of visitation privileges, without reasonable justification, might well be cruel and unusual punishment. 481 F.2d at 661.

■ The position this Court here attempts to express and espouse has been previously well stated.

[With respect to] the entry of people into the prisons for face-to-face communication with inmates, it is obvious that the institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, "prison officials must be accorded great latitude". Pell v. Procunier, 417 U.S. at p. 826.

■ This petitioner has a constitutional right, protected by the First Amendment, to communicate with friends, relatives and attorneys by means of visits and correspondence.[29] We do not argue for unrestricted visitation. None but the most obtuse would fail to recognize that visits on that order would necessarily and intolerably interfere with the orderly administration of a prison. We address our remarks only to the invidious practices of which petitioner complained which, had they been established by competent evidence, would constitute cruel and unusual punishment.

■ Petitioner complains that he was not permitted to have visits with his mother in areas utilized for such purposes by other prisoners similarly restrained in isolation.

---

[29] Petitioner's sister testified that on more than one occasion, letters to her brother were returned with notations to the effect that he was not at the insitution when, in fact, he was.

461

Courts are unanimous in their admonition to correctional institutions, state and federal, that a comfortable, sheltered area for visitation must be provided; and that except for security purposes, properly implemented, these visiting areas should not physically separate the inmate from his family visitor. Moreover, reasonable time should be allowed for each visit and visitors should not be subjected to unreasonable searches and hours of waiting before the inmate is produced, as some of petitioner's visitor witnesses complained. See James v. Wallace, supra.

Once more we have written, this time respecting visitation, for the information and guidance of the Bureau of Corrections. While we do not so decide at this time, we bring to the attention of the Bureau of Corrections for its earnest and careful consideration the possibility that it might be called upon to entirely underwrite the expenses of family visits, if it chooses to incarcerate its prisoners thousands of miles from their home. This, we feel, might necessarily follow if indeed the right of a prisoner to visits with his family is of such a fundamental character that government cannot deprive him of it without trenching on the United States Constitution, more particularly, the Eighth Amendment thereof.

## VI

Before concluding, the Court must address respondent's contention that in Gereau v. Henderson, Civ. No. 19632 (N.D. Ga. 1974), aff'd 526 F.2d 889 (5th Cir. 1976), petitioner litigated the same issues he now raises. It is to be inferred from this argument of respondent, for he does not so state expressly, that the doctrine of res judicata should bind this Court's hand and compel the outright dismissal of the instant petitioner. We do not agree and our answer is threefold. Firstly, while the basic contention of petitioner, i.e., the illegality of his transfer and detention in

federal custody, was maundered, the theories advanced as the bases of the claimed illegality were outlandish, to say the least.[30] Those arguments, properly and soundly rejected, were, thankfully, not asserted here. Such contentions, advanced on behalf of prisoners of a territory of the United States, given the constitutionally granted powers of the Congress of the United States,[31] are patently frivolous, not even deserving of the consideration given them by the Court of Appeals, and may suggest something as to the effectiveness of the counsel afforded petitioner in those proceedings.[32] Secondly, Gereau v. Henderson made a basic assumption of fact that there had been a regularly processed transfer of custody pursuant to existing law and accomplished on the order of a duly constituted and authorized official.[33] But now with the supposed transfer of peti-

---

[30] As examples, in Gereau v. Henderson it was contended (a) that powers expressly reserved to the states had been usurped and exercised by the Federal Government; and (b) that the transfer of a territorial prisoner to a federal prison offends state sovereignty and is beyond the power of Congress to so authorize.

[31] See Article IV, § 3 of the Constitution of the United States.

[32] The suggestion looms large when one considers that the petition in the District Court had stated that, upon sentencing, relators had been remanded to the custody of the Attorney General of the Virgin Islands, revealing a markedly significant lack of knowledge of Virgin Islands law, thus leading to the descent which inevitably occurs when "the blind leads the blind".

[33] In this misconception, the Gereau court is not singular. The Court of Appeals for the Third Circuit, in its decision remanding this very cause to us, fell into the same error saying that

". . . Petitioner was transferred from the Virgin Islands to the federal correctional facility at Atlanta, Georgia, in the United States, pursuant to a contractual agreement between the U.S. Bureau of Prisons and the Commissioner of Public Safety . . ."

In a footnote the Circuit Court went on to say

"He (the Commissioner) has statutory authority to transfer prisoners from the Virgin Islands to the United States but retains constructive custody of the prisoner."

Indeed the implanting of the seed from which the Third Circuit's misunderstanding grew may have taken place in this Court's Memorandum of November 4, 1976, in which we denied relief to the petitioner for we there stated

The Commissioner of Public Safety . . . who holds penal authority over persons convicted of crime in the Virgin Islands, by virtue of a contractual arrangement with the U.S. Bureau of Prisons, caused the petitioner to be transferred to the federal correctional facility at Atlanta, Georgia. . . .

This Court, having heard the evidence, now knows better.

tioner subjected to the glaring light of day, the assumption of an authorized removal of petitioner is seen as wholly unfounded. There was, in fact, no statutory authority for the transfer at that time. Moreover, the Commissioner of Public Safety, the legal custodian of petitioner, but to whom he was never in truth actually committed, in no way figured in the decision to spirit petitioner out of the Virgin Islands. Thirdly, our Court of Appeals in Ali v. Gibson, 15 V.I. 548 (3d Cir. 1978) concluded

No other District Court of the United States (other than the District Court of the Virgin Islands) may be able to exercise jurisdiction over petitioner's claims under 28 U.S.C. § 2241, for that section is limited to habeas corpus relief primarily for those held in violation of federal law or the constitution. The petitioner's claims may not make out such a case inasmuch as he alleges violations of the Virgin Islands Code. Therefore, unless the territorial court in the Virgin Islands has jurisdiction to hear petitioner's claims, . . . petitioner would be without a forum.

The message this Court receives from the Third Circuit Court of Appeals, therefore, is that the Court in Gereau mistakenly assumed jurisdiction where in reality it had none. For this, and the other reasons expressed above, the Gereau v. Henderson decision is entirely lacking in controlling weight.

## VII

We now write on the assumption that the Legislature of the Virgin Islands will, by appropriate action, once again vest the Director of the Bureau of Corrections with the authority to order the transfer of prisoners to federal facilities in cases which, in his discretion, require such action. If the Legislature so acts, it is certain that prisoners will, from time to time, be sent to the mainland for incarceration in federal custody. This means that the stream of pro se petitions and letters will continue to flow, all seeking return to the Virgin Islands of the petitioners or

letter writers. For the most part, such pleas will fail once the Director of the Bureau is properly armed with statutory authority and acts within constitutional limitations. What follows now is intended to make the effective functioning of the Director's office in the area of prisoner transfer easier of accomplishment, and at the same time reduce the increasing burden on the District Court.

In Barnes v. Gibson, 14 V.I. 345 (D.V.I. 1977), we directed the predecessor of the Bureau of Corrections to "promulgate written rules which set forth prohibited conduct with specificity", to the end that prisoners may be protected from arbitrary, capricious and constitutionally infirm treatment (see Part V of Memorandum Opinion). We still steadfastly adhere to the positions there expressed and adopt them as a part of this opinion.

■■■ The prohibition in Barnes against arbitrary, capricious and unreasonable disciplinary measures we now expand to cover the matter of prisoner transfers to mainland institutions. To insure against the type of action we prohibit, the Director must promulgate appropriate guidelines and rules and regulations governing such transfers and, as and when promulgated, such guidelines and rules and regulations must be submitted to this Court for its approval. Among other things, such guidelines, rules and regulations must provide to all inmates to be transferred an adequate hearing at which minimal due process procedures must be observed. We hold that an inmate to be transferred is entitled to a hearing before such transfer can be legally effected. We hold further that the inmate to be transferred must be accorded the hearing we have here directed, whether the transfer be labeled administrative or disciplinary, unless the inmate himself, in writing, consents to the transfer or otherwise waives his right to a hearing. We do not distinguish between the administrative and disciplinary transfers because too often the difference between

the two is the bone of much contention. The dividing line between one and the other is so thin that at times one is led to conclude that the distinction is one without difference. Even with the most careful scrutiny it is, at times, impossible to tell where the one ends and the other begins. By providing for a hearing in either case, we hope to eliminate the possibility of abuse by correction officials.

As we did in Barnes, supra, we again commend to the Bureau's attention Wolff v. McDonnell, 418 U.S. 539 (1974). In addition to Wolff, we direct the Bureau's attention to other instructive cases bearing on this matter such as Walker v. Hughes, 558 F.2d 1247, 1256–60 (6th Cir. 1977); Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H. 1973) (to the extent that decision is not inconsistent with Wolff); and Baxter v. Palmigiano, 425 U.S. 308 (1976).

 Once more we list what we gather from our reading of Wolff v. McDonnell to be the minimum procedural safeguards necessary to a proper due process hearing. (1) Advance written notice to the inmate of the proposed transfer. (2) A written statement of the facts or circumstances relied upon by the Bureau and upon which it has made the determination that the inmate should be transferred. (3) If deemed necessary by the inmate, he should be allowed to call witnesses and to present any documentary evidence available to him in an effort to establish that the transfer is unwarranted (this must be accorded the inmate unless the Bureau officials, in writing, state that to do so would be unduly hazardous to institutional safety or correctional goals). (4) Where the inmate is illiterate or by reason of complexity of issues it is unlikely that he will be able to collect and present the evidence necessary for adequate comprehension of the case, the inmate should be free to seek the aid of a fellow inmate as his representative, or if this is deemed not feasible, he should be afforded adequate substitute aid which may take the form of either

466

help from a staff member or from a sufficiently competent inmate designated by the staff.

We acknowledge that our view, that in cases of these institutional transfers a hearing is required, is one that is not universally shared. We are aware, too, that such decisions of the United States Supreme Court as Meachum v. Fano, 427 U.S. 215 (1976) and Montanye v. Haymes, 427 U.S. 236 (1976), have been widely cited for the proposition that no hearing is required for an institutional transfer. We believe those cases to be inapposite. Both dealt with intrastate transfers of state prisoners. Moreover, the factual setting of the case sub judice is so dissimilar to that of Meachum or Montanye that we believe a different result is demanded. We do not see how we can fail to take into account the difference in weather conditions, culture, and geographical distance that are involved in a transfer from the Virgin Islands to the mainland. Moreover, with the inmate so far distant from the warden in whose constructive custody he remains, and so far out of touch with the Parole Board to which his application for such release must be directed, we believe so substantial a difference exists between these cases and the instant case as to require a different result. Moreover, we must take note of the well-entrenched tendency of our correctional regime of paying little regard, or having little or no contact with a prisoner, once he has been transferred. In this respect, we feel compelled to mention a report that we received only recently from our Probation Department after officers of that office had visited Virgin Islands inmates and the staffs at four federal institutions, Miami, Tallahassee, Atlanta, and Petersberg. In sum, the findings of those visiting officials were that communication between the institutions and the Virgin Islands ranged from extremely poor to non-existent, in that Virgin Islands officials consistently failed to answer letters addressed to them about inmates, causing federal

prison officials to conclude that once a prisoner is sent to the United States he is forgotten by Virgin Islands officialdom. Also, the report was critical of the fact that there can be no work release for Virgin Islands prisoners on the mainland, a lack which considerably hampers rehabilitative efforts. Furthermore, Virgin Islanders are not permitted furloughs, as are other inmates, because of the financial burden and the distance that would be involved. It was also noted that officials of the Virgin Islands prison system do not make regular visits to the institutions where our prisoners are incarcerated. These must be considered to be serious deficiencies and have been taken into consideration by this Court as factors which militate in favor of its determination that before prisoners may be relegated to such a deplorable existence they must be accorded a hearing.

Towering above all the hard lines that must be suffered by transferred Virgin Islands prisoners is the inability, for financial reasons, geographical distance, and other adverse circumstances, to have family visits. If we are correct in our conclusion that visits by family members are to be regarded as one of the constitutionally guaranteed rights of prisoners, then the matter of transfers on the whole must be re-examined, for if we insist on removing our prisoners so far away from their homes, and if this practice is to pass constitutional muster, the Government of the Virgin Islands will simply have to provide the money to meet travel expenses for at least a minimum number of family visits per year for each inmate so transferred.[34]

---

[34] Section 6.2 of the "Tentative Draft of Standards Relating to the Legal Status of Prisoners" earlier mentioned in the text of this Opinion provides, "Correctional authorities should facilitate and promote visitation by providing transportation for visitors *at least* from terminal points of public transportation. Where the prisoner and the family are indigent, authorities should pay transportation costs for periodic visits by up to three members of the prisoner's immediate family." (Emphasis supplied.)

We are not unaware that other courts have held that transfers from state to federal institutions over long distances present no constitutional violation. In Hillen v. Director of Department of Social Service & Housing, 455 F.2d 510 (9th Cir. 1972), a state prisoner of the state of Hawaii, who had been transferred to California's Folsum State Prison against his will, appealed to the District Court of Hawaii for relief. That District Court dismissed the prisoner's action and he appealed. The Court of Appeals for the Ninth Circuit affirmed the dismissal holding that this transfer, pursuant to the Western Interstate Corrections Compact, presented no issue related to federally protected constitutional rights of the prisoner. Against that decision, however, we must measure Lono v. Fenton, 581 F.2d 645 (7th Cir. 1978). Lono v. Fenton dealt with the application of a state prisoner of the state of Hawaii who had been transferred to the federal penitentiary at Marion, Illinois. The District Court for the Eastern District of Illinois in the person of Chief Judge Foreman, the author of Bono v. Saxbe cited above, dismissed the petition. On appeal, the Seventh Circuit reversed, holding that § 5003 of Title 18 does not provide for federal housing of state or territorial prisoners simply for safekeeping. Rather, held the Seventh Circuit, those transfers are authorized, in the words of the statute, only for "treatment" of state prisoners. In this holding, the Seventh Circuit was amply supported by the legislative history of that section when it was before the Congress. The Seventh Circuit was of the opinion that such transfers could be approved only when they measured up to the legislative intent, that is to say, were effected for the "custody, care, subsistence, education, treatment, and training" of the state or territorial offender. That circuit put the matter very bluntly.

It was not intended by § 5003 to put the Federal Government in the rent-a-prison business unless there was some special treatment

need with which the state required assistance. Absent that special need the States were left to care for their own.

The Lono v. Fenton decision still stands and is one that will have to be taken into account unless the Supreme Court of the United States rules otherwise.

This Court is not unmindful that Lono v. Fenton has been criticized. See Sisbarro v. Warden, Mass. State Penitentiary, 592 F.2d 1 (1st Cir. 1979). The Court of Appeals for the First Circuit deliberately chose to disregard the clear and unambiguous legislative history of § 5003. For the time being, we will await further rulings on the subject, particularly from the United States Supreme Court, before we take a position one way or the other on this disputed matter.

## CONCLUSION

Seven years have gone by since the murders at Fountain Valley, and six years since the petitioner and his co-defendants were found guilty and were sentenced for those atrocities. The passage of time, however, does not seem to have too much abated the frenzy, the ill will, the poorly considered and harsh rhetoric, the desire for revenge and the general bad feeling engendered by the incident.[35] This display of human frailty is to be regretted. The desire for vengeance must give place to the rule of law. Petitioner has been sentenced to such a term of imprisonment that his normal parole eligibility is 73 years hence.[36] True, the severity of his sentences could have been maximized had the Court elected to have them all run consecutively, with

---

[35] This judgment is based on the abuse to which this Court has been subjected during the pendency of this matter. Not only by letters addressed to the Court, anonymous for the most part, but also the frequency of letters to the editor from quite diverse quarters and above all the highly abusive telephone calls received at home.

[36] Title 5 V.I.C. § 4601 does provide for an earlier eligibility release date. However, due to the statutory prerequisites which must be satisfied in order to obtain such parole it is unlikely that petitioner would ever qualify for an early release date.

the six 15-year sentences for assault in the first degree and robbery to be completed before the first life sentence began. The Court, however, did not choose to do so.

It behooves this community to bring itself to the understanding that justice has been done; that no good purpose will or can be served by forever keeping open this cankerous sore of the body politic. The barbarity of the offenses for which petitioner was convicted notwithstanding, it must be once and for all realized that he yet is a human being, "a prisoner who has not shed his basic constitutional rights at the prison gate".[37]

We would all do well to usher in that wholesome and sorely needed season of nirvana, in which the hallmark will be remission. That era should be now, a time of "binding up" our collective wounds, not squandering our energies in vengeful quests, but rather bending our efforts to insure that never again shall the shame of such dastardly deeds envelop our island home.

---

[37] Marshall, J., concurring in part and dissenting in part, Wolff v. McDonnell, 418 U.S. at 581.