**Edward Thomas WILSON, Plaintiff,**

v.

**NEVADA DEPARTMENT OF PRISONS et al., Defendants.**

**Civ. No. R–80–56–ECR.**

United States District Court,
D. Nevada.

April 17, 1981.

Edward Thomas Wilson, pro. per.

Richard Bryan, Atty. Gen., Carson City, Nev., for defendants.

## ORDER

REED, District Judge.

Plaintiff has brought a civil rights complaint pursuant to Title 42 U.S. Code, Section 1983 seeking damages on account of alleged violation of his claimed constitutional rights to receive visitation at the Condemned Men's Unit (CMU) at the Nevada State Prison, from non-family members, and seeking a declaratory judgment that the visitation regulations and procedures of the prison for said unit are in that respect unconstitutional. During the course of the trial plaintiff abandoned his claim for damages and the remaining issue before the Court is whether existing visitation regulations and procedures of the prison for the Condemned Men's Unit as they apply to plaintiff are valid under the United States Constitution.

Plaintiff is an inmate in the Condemned Men's Unit which is the death row of the prison. He has been sentenced to the death penalty and has remained an inmate of CMU since December 1979.

This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343.

During the course of the trial of the action on March 10, 1981, the Court received evidence bearing on the damages issue which is no longer in the case and such evidence will not be referred to here.

The basic question remaining requires consideration of whether there is a rational basis for the present visitation rule applicable to CMU inmates so far as it relates to non-family members. CMU inmates may request that up to two non-family members be permitted to visit with them. The inmates are free to give notice at any time requesting that any visitor who has been authorized visits be deleted from the list and that a substitute individual non-family member be placed instead on the list.

Once the inmate requests that an individual non-family member's name be placed on the list, a questionnaire is sent to that person. If the questionnaire indicates that the individual has been arrested for a serious offense or other information is indicated thereon showing that there might be some reason that such individual should be denied visiting privileges, then his or her name is run through a governmental agency so as to ascertain if he or she has a criminal record and the nature of it. This procedure takes about three weeks in all. An investigation officer from the prison staff does a follow-up check if such is indicated. The final decision as to whether the person will be permitted to visit lies with the Superintendent of the prison. If it appears the person has a serious criminal record or has falsified the answers to the questionnaire, the Superintendent under the procedure may deny visitation rights.

In the event that an inmate desires to delete a name from the approved list of non-family members and suggests a new name, then the same procedure is followed as upon the original designations.

This same procedure is followed both for CMU inmates and those inmates who are in what is known as the general population of the prison. The only difference is that CMU inmates are permitted a total of only two non-family visitors while general population inmates are not so limited and may apparently have an infinite number of approved visitors.

Prison regulations permit additional non-family members to visit inmates who are within 30 days of an execution date which appears to be final, i. e., not subject to further appeals or court action.

Howard Pyle, Program Director at the Prison, testified at length as to the reasons why this difference as to the number of authorized visitors exists as between the general population and the CMU inmates. He contended that merely limiting the number of persons who could visit a CMU inmate on any one day would not satisfy the concerns of the prison authorities. As he put it, if he were permitted to put ten fishing lines in the river rather than merely one, he would do it because you would have more chance to catch fish that way. Mr. Pyle testified that the CMU inmates are the most incorrigible of the inmates in the prison; constitute the highest escape risk; are capable of the highest level of violence; and are most likely to attempt to escape. The prison authorities weigh the security risk relating to visitation of CMU inmates substantially higher than the security risks involved in visitations to general population prisoners. It is the prison authorities view that the more visitors an inmate has, the more opportunity to abuse the rules, introduce contraband, make arrangements for escape, and effect escapes. He pointed out that the purpose of visitation for CMU inmates is manageability of the inmates while there are broader penal institution purposes for visitation to general population inmates, where such things as rehabilitation (not applicable to CMU inmates) play a role in determining visitation policies. Even prisoners who have received sentences of life without possibility of parole have hope of eventual release while CMU inmates may not have such hope although it appears that those in the unit may well, through legal means, escape execution. Nevertheless, it is clear from the evidence that the very nature of the incarceration of CMU inmates does create a higher security risk and does create problems not found when considering visitation of general population inmates.

Introduction of contraband into the prison is a serious problem in respect to the general population units as well as the CMU. All sorts of contraband including drugs and weapons have been introduced into the prison despite all efforts of the prison officials. They have a justifiable concern about this problem.

The prison officials did not point out any specific cases or specific experience as a basis for claiming that more contraband is introduced by non-family members than family members or CMU inmates than general population inmates, or that more escapes have been effected by CMU inmates than general population inmates or that more violence has been committed by CMU inmates than general population inmates.

Prison officials believe that non-family members are more likely to introduce contraband into the prison or be subject to manipulation by inmates than family members. Their experience is that family members are less likely to be involved in criminal activity and that the inmates are less likely to try to take advantage of family members. The problem that exists is a two-way street of introduction of contraband into the prison and the creation of security problems through the visitations, on the one hand, and the potentiality that the inmates will try to take advantage of or extort money or favors from the visitors, on the other hand. In the case of the plaintiff his former fiance, Kelly Sue Morrisey, received a threatening letter from him requiring certain favors or considerations as against a threat that he would mail certain photographs of her to family members.

The procedures for handling of the actual contact visitations appear to be the same for general population inmates as for CMU inmates except that inmates taken from CMU to the visitation room are more securely manacled and are accompanied by two correctional officers. It appears that other inmates may proceed to the visitation room without similar supervision.

Death row inmates are isolated from the general population and apparently see only other like situated inmates. They are in need of visitations to a greater extent than other inmates.

The issue before the Court then is to determine whether these regulations so limiting the number of approved visitors which CMU inmates may receive is rational and constitutionally valid.

The Court should give deference to the view of the prison authorities. The Supreme Court has admonished that federal courts should avoid enmeshing themselves in the minutiae of prison operations in the name of the Constitution. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). This Court is compelled to use great restraint "... before issuing orders based on a finding that the state has followed unlawful procedures in discharging the unenviable task of keeping dangerous men in safe custody under humane conditions." *Spain v. Procunier,* 600 F.2d 189, 193 (9th Cir. 1979).

The Court is ill equipped to administer the prison and is not placed in a proper position to determine if there could be a better system or if some other system would provide equal security or be more humane. The Court, before attempting to interfere in prison administration, should determine whether its actions will impair prison security. As recently stated by the Ninth Circuit, "If such impairment is a likely result, the court must give explicit consideration to the practicality of the remedy in light of legitimate security concerns." *Wright v. Rushen,* 642 F.2d 1129 slip op. at 1134 (9th Cir. 3/13/81); *see also United States ex rel. Raymond v. Rundle,* 276 F.Supp. 637 (E.D.Pa.1967) (plaintiff sentenced to death and institution lacked sufficient personnel to supervise visits, proper basis existed to limit plaintiff's visitors).

■ The sole inquiry of the Court is limited to the constitutionality of the present regulations. A civil rights action under § 1983 is the proper remedy for a state prisoner to make a constitutional challenge to conditions of his prison life (as opposed to a writ of habeas corpus which challenges

the constitutionality of the fact or length of this confinement). *Preiser v. Rodriquez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). The plaintiff's contentions that prison officials, by their policy limiting the visitation of inmates in the CMU to immediate family members and two non-family members, are violating, under color of state law, his rights to freedom of association, due process and equal protection of the law are cognizable by the Court. 42 U.S.C. § 1983; Amendments 1 and 14 of the Constitution; *see Mabra v. Schmidt*, 356 F.Supp. 620, 630 (D. Wisconsin 1973) (Right of prisoners to visitation afforded under 1st and 14th Amendments cognizable); *cf. Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972) (class of *pretrial* detainees has 1st Amendment right to visitation). Beyond this, prison visitation procedures may be unconstitutional if they are arbitrary and capricious. *See Procunier v. Martinez*, 416 U.S. 396, 411, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974); *Jones v. Diamond*, 594 F.2d 997, 1013–14 (5th Cir. 1979).

The Court has balanced the constitutional rights of the plaintiff against the security and administrative needs of the prison. His right to free association has not been totally curtailed. He may visit with family members and two non-family members. The differentiation between condemned men's visiting privileges and those of prisoners in general population is rationally based. The members of the CMU may reasonably be considered more dangerous and the societal interest in their rehabilitation, through greater visitation, is not as great as with other prisoners. The regulation restricting their visitation is not arbitrary and capricious in that it has a logical basis and was established in accordance with Nevada law. *See* NRS 209.423. Nevada law requires that visitation regulations must be reviewed and approved by a lay Board of Prison Commissioners. *Id.* This regulation, 328(6), was so approved and states the rationale behind its implementation.

The Court notes that lawful imprisonment necessarily brings about the withdrawal or limitation of many privileges and rights, "... a retraction justified by the considerations underlying our penal system." *See Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Furthermore, more stringent regulations on visitations have survived judicial scrutiny. *See Labat v. McKeithen*, 361 F.2d 757 (5th Cir. 1966); *Jones v. Diamond, supra; Feeley v. Sampson*, 570 F.2d 364 (1st Cir. 1978) (No constitutional right to visitation); *see also Marcera v. Chinlund*, 595 F.2d 1231, 1241 (2nd Cir. 1979).

The regulation as it stands today is reasonable and valid. Declaratory or injunctive relief is unwarranted. The plaintiff, during the trial, expressly withdrew any claim for damages. The Court rules in favor of the defendants as to all claims.

This order shall constitute the findings of fact and conclusions of law in this case.

IT IS, THEREFORE, HEREBY ORDERED that the Clerk of the Court enter judgment in favor of defendants and against plaintiff.