**Lemuel SMITH, Plaintiff,**

v.

**Thomas A. COUGHLIN, III, Commissioner of the New York State Department of Correctional Services, and Charles J. Scully, Superintendent of Green Haven Correctional Facility individually and in their official capacities, Defendants.**

**No. 83 Civ. 5160 (DNE).**

United States District Court, S.D. New York.

Jan. 6, 1983.

Mark Gombiner, Robert Gombiner and William Kunstler, New York City, for plaintiff.

Atty. Gen., Robert Abrams, New York City, for defendants; Tarquin Bromley and Richard Howard, Asst. Attys. Gen., New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

EDELSTEIN, District Judge:

The plaintiff, Lemuel Smith, was convicted of murdering a prison guard while serving a life sentence for murder. Plaintiff was sentenced to death, and, immediately following the sentence, was moved from the general prison population to a unit for condemned persons ("UCP") at the Green Haven Correctional Facility to await execution. Plaintiff has appealed his conviction to the New York Court of Appeals, which has not yet heard oral argument on the appeal. Plaintiff complains in this case that the conditions of his confinement vio-

late his state-created statutory rights and his federal constitutional rights.

Plaintiff moved for a preliminary injunction. Hearings were held on July 25, 26 and 27, 1983. With respect to some of the challenged conditions the court suggested compromise solutions and engaged the parties in a discussion of them. At the court's urging, defendants made adjustments to the conditions of confinement, *see infra* note 2.

The court denied the prayer for preliminary relief. Tr. 444–45.[1] The court reserved decision on the prayer for permanent relief and instructed the attorneys to furnish it with proposed findings of facts and conclusions of law as well as a statement of what prior points of contention had been settled. The plaintiff's papers were submitted on September 21, 1983, and defendants' papers were submitted on September 22, 1983. The parties agreed at the conclusion of the hearing that all the evidence relevant to the court's final decision on the merits had been adduced at the hearing and that there was no need for a further trial of the issues.

FACTS [2] AND PLAINTIFF'S CLAIMS

Mr. Smith is the only prisoner in the UCP. He is confined in a prison cell measuring ten feet by six feet. It is clean and adequately lighted and ventilated. He may not retain personal items such as books, papers, pencils, cleaning implements and toothbrushes in his cell, but may obtain these items for use by requesting a correction officer to bring them. Mr. Smith may

watch television or listen to a radio 24 hours a day. The television and radio are situated about five feet outside his cell, and they are turned on and off by a correction officer at Mr. Smith's request.

He may leave the cell at about 8:30 a.m. once a day for an exercise period in a yard that measures about 20 feet by 20 feet, and he may stay there until about 3:30 p.m. when the guards' shift changes. For his exercise, he has available sneakers, a handball, a basketball and a basketball hoop.

Mr. Smith is visited by a nurse or doctor once a day, who see after his health, and a psychiatrist sees him on a regular basis. Mr. Smith has no contact with other inmates.

Mr. Smith is allowed to have contact visits with his attorneys, but he is not allowed to have visits, contact or noncontact, with paralegals, law students or legal investigators including those working for his attorneys. Plaintiff claims that this prohibition violates his sixth amendment rights by depriving him of access to the courts.

Mr. Smith is allowed only noncontact visits with any of the twenty relatives in his immediate family, who are on a list of approved visitors. He is not permitted to visit with friends who are not relatives. Plaintiff claims that these restrictions violate his first amendment right by depriving him of his right to free speech.

Mr. Smith is allowed to have contact visits with Father Donovan, a Catholic priest, and four other authorized clergy-

---

**1.** "Tr." refers to the transcript of the July 25, 26 and 27, 1983 hearings.

**2.** The facts recited here about Mr. Smith's confinement describe the conditions existing after the resolution of several points of contention between the parties. In each instance, the resolution emerged from a suggestion by the court followed by discussion with the parties. The defendants have agreed to allow Mr. Smith to have contact visits with his attorneys and to seal letters after reading them in order to allay his fears that the confidentiality of his mail was being impaired. The defendants have also clarified the exercise policy—Mr. Smith may go to the exercise yard at the beginning of a guards' shift, about 8:30 a.m., and stay until the guards'

shift changes in the midafternoon. The parties have also resolved the problem of finding appropriate footwear for Mr. Smith; at the court's suggestion the defendants will provide Mr. Smith with loafers for use in his cell. Tr. 374. The parties have also resolved the problem of Mr. Smith's access to his legal materials, which are kept in a cell adjoining his, by the formulation of an inventory system that he may keep in his cell and that will enable him to call for materials that he desires. The defendants have reaffirmed that any law books Mr. Smith requests will be supplied within 24 hours, and if the books are not available, notice to that effect will be given to him within the same period.

men. Father Donovan conducts a Catholic Mass for Mr. Smith once a week. On these occasions the guards are present and participate. Tr. 306. Mr. Smith is not allowed to attend group religious services with other inmates. Plaintiff claims that this restriction on his access to group services violates his first amendment rights by interfering with his practice of religion.

Plaintiff further claims that the totality of the conditions of his incarceration violates his eighth amendment rights by subjecting him to cruel and unusual punishment.

A further contention is that the totality of circumstances under which he is incarcerated will lead to his physical and mental deterioration in consequence of which he will lose his will to fight his conviction through appeal. Such a result, he claims, would violate his sixth amendment rights of access to the courts.

Plaintiff makes a point that he had liberty interests [3] in certain aspects of his confinement, such as contact with other inmates and contact visits, and that the state's deprivation of these interests based solely upon imposition of a death sentence violates his fifth and fourteenth amendment rights by depriving him of liberty without due process of law.

Plaintiff attacks the statutory authority upon which the defendants rely for authorization to transfer him from the general inmate population to the UCP, N.Y.Correct.Law § 650, as unconstitutional in that it deprives him of the equal protection of the laws with respect to others similarly situated, i.e. other inmates, in violation of his fourteenth amendment rights.

Plaintiff also claims that the conditions of his incarceration in the UCP violate New York State's statutory and regulatory prescriptions for imprisonment. *See* N.Y.Correct.Law § 650 and Correctional Services Regulations Title 7, Part 300.

Added to this is the claim that his transfer to the UCP without a hearing violates a consent decree entered into by New York State in *Kozlowski v. Coughlin,* 539 F.Supp. 852 (S.D.N.Y.1982).

## DISCUSSION

### A. State Law Claims

New York Correction Law § 650 states in pertinent part,

> From the time of such delivery to such superintendent [the delivery of the warrant of execution], until the infliction of the punishment of death upon him … the defendant shall be kept in a segregation unit at such state institution and no person shall be allowed access to him without an order of the court, except the officers of the prison, his counsel, his physician, a priest or minister of religion, if he shall desire one, and members of his family.

This provision specifically authorizes three of the conditions about which Mr. Smith complains. Section 650 orders Mr. Smith's transfer to a segregated unit; it bars his access to other inmates; and it bars his access to friends who are not members of his family. The condition that restricts all visits to noncontact visits, except those with lawyers and religious ministers, and the condition that requires Mr. Smith's personal property and his legal papers be stored in the adjoining cell are not mandated by the terms of the statute, but are based on a rational interpretation of § 650 [4] given the evident security purposes of that

---

**3.** Plaintiff's reasoning is that either New York State law or the federal Constitution grants him rights to certain liberties, e.g. to be free from certain onerous restrictions like the ban on contacts with other inmates, even following incarceration for a murder conviction. These liberties, plaintiff reasons, are "liberty interests," which a state may not infringe without providing due process of law under the fifth and fourteenth amendments to the Constitution.

**4.** Courts should not interfere with a prison administrators' rational interpretation of correction law statutes. "Prison administrators … should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

statute.[5] The ban on visits by paralegals and law students, is also not barred by the language of the statute; the interpretation of the statute in this regard is discussed further *infra,* section D, in light of the plaintiff's constitutional right of access to the courts.

Plaintiff attacks the conditions of his confinement by relying upon the part of § 650 that dictates the defendant be placed in a "segregation unit" and also upon the state regulations for segregation units. 7 N.Y.CRR Pt. 300 *et seq.* In 1974 the New York State legislature amended § 650 by substituting "segregation unit" for "solitary confinement." Thus, plaintiff reasons, this amendment manifested a legislative intent that the conditions in the UCP comply with the state regulations governing segregation units and these regulations, Title 7 Part 300 of the Correctional Services Regulations, require the defendants to grant the plaintiff most of what he requests.[6]

The state counters with the contention that the UCP is expressly exempted from the regulations. Section 300.1(c) reads:

> For purposes of this Chapter, the cells at Green Haven Correctional Facility reserved for confinement of persons under sentence of death [the UCP] shall not be deemed to be part of the correctional facility and shall be considered to be a separate institution.

The state contends that this provision in the "Applicability" section of the regulations exempts the UCP from the regulations governing segregation units. Such an exemption makes § 300.1(c) meaningful, the defendants reason, because no other discernible purpose exists for inserting this provision in the regulations.

New York State officials in construing § 650 and their segregation unit regulations, 7 N.Y.CRR Pt. 300 *et seq.,* have acted in the capacity of an agency, which has expertise and experience in prison administration. The realities of prison life are horrible; prisons are dangerous and unpleasant places. For this reason prison officials are granted great deference by the courts in administering their institutions. A court should overturn an agency's interpretation of relevant legislation and regulations only when the agency's interpretation is clearly erroneous. *Immigration and Naturalization Service v. Stanisic,* 395 U.S. 62, 72, 89 S.Ct. 1519, 1525, 23 L.Ed.2d 101 (1969) ("Granting that this regulation and its successor provision are not free from ambiguity, we find it dispositive that the agency responsible for promulgating and administering the regulation has interpreted it . . . ."); *Abbott-Northwestern Hosp., Inc. v. Schweiker,* 698 F.2d 336, 340 (8th Cir.1983); *Bright v. Ball Memorial Hospital Association, Inc.,* 616 F.2d 328, 333 (7th Cir.1980); *see also NRDC v. U.S. Nuclear Regulatory Commission,* 582 F.2d 166 (2d Cir.1978).

The plaintiff has failed to meet this burden with respect to the New York Department of Corrections' interpretation of § 650 and the segregation unit regulations. The court finds the defendants' interpretation is a reasonable and correct construction of the statute and regulations and is consistent with the purpose of the statute.

**B. Eighth Amendment Claim**

Plaintiff's claim that the totality of the conditions of his confinement constitute cruel and unusual punishment, which is barred by the eighth amendment, is without merit. Although the eighth

---

**5.** The purpose of § 650, to maintain security in the prison by incarcerating an inmate proven to be dangerous in a high security setting, is evident on the face of the provision. In drafting Department of Correctional Services Directive #0054, which governs conditions in the UCP, Deputy Commissioner Arthur Leonardo considered security problems paramount in construing the mandates of § 650. Tr. 285–93 and 320–22.

**6.** There is no legislative history to the amendment to Correction Law § 650. The legislature could have meant simply to eliminate archaic language from the statute. The phrase, "solitary confinement" is now understood generally to describe complete isolation, which is not the sort of confinement dictated by § 650.

amendment bars more than physical torture, it does not reach conditions of incarceration that incidentally impose unpleasant consequences on an inmate unless those conditions are "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1980), *quoting Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). The "constitution does not mandate comfortable prisons ...." *Id.* at 347, 101 S.Ct. at 2399. It bars only conditions that "involve the unnecessary and wanton infliction of pain." *Gregg, supra*, 428 U.S. at 173, 96 S.Ct. at 2925.

■ Mr. Smith's incarceration is hardly an agreeable condition of life. He lives in an environment surrounded by constraints. His creature comforts are limited, but his physical and mental discomforts are minimized to the extent permitted by security requirements.[7] Testimony at the hearing established that Mr. Smith is not suffering from any psychological damage as a result of the conditions of his incarceration. *See* discussion in section D *infra* with respect to Mr. Smith's sixth amendment claim. In sum, the court finds that Mr. Smith's incarceration falls far short of constituting the cruel and unusual punishment contemplated by the eighth amendment.

## C. First Amendment Claims

Plaintiff claims that he has a first amendment right to visit with "friends,"

whether related or unrelated, and to have contact visits. The claim is based upon the analysis in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Although *Pell* held that a California regulation barring members of the press from face-to-face interviews with inmates passed constitutional muster, the Court stated,

> a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell, supra*, 417 U.S. at 822, 94 S.Ct. at 2804.

Courts apply the *Pell* test with respect to regulation of noncontact visits,[8] whether acknowledging a constitutional basis or not:[9] "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system." *Pell, supra*, 417 U.S. at 822, 94 S.Ct. at 2804. Courts must also note that because of the complexities of running prisons, correction officials must be "accorded wide ranging def-

---

7. *See* the discussion of the facts, *supra*, including note 2 discussing the compromises already made between the parties, for the ways Mr. Smith's discomforts have been minimized.

8. Courts agree that there is no first amendment constitutional right to *contact* visits. *McMurry v. Phelps*, 533 F.Supp. 742, 765 (W.D.La.1982); *Valentine v. Englehardt*, 492 F.Supp. 1039 (D.N.J.1980); *Bono v. Saxbe*, 450 F.Supp. 934, 947 (E.D.Ill.1978), *aff'd in part and remanded in part on other grounds* 620 F.2d 609 (7th Cir. 1980). Even pretrial detainees have no right to contact visits. *Jones v. Diamond*, 594 F.2d 997, 1013 (5th Cir.1979) *cert. dismissed* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1983).

9. Some courts have held that some kind of visitation is a constitutionally protected right of

inmates under *Pell*. "This [prisoner] has a constitutional right, protected by the First Amendment to communicate with friends, relatives and attorneys by means of visits and correspondence." *Ali v. Gibson*, 483 F.Supp. 1102, 1119 (D.V.I.1980) *aff'd in part and rev'd* 631 F.2d 1126 (3d Cir.1980) *cert. denied* 449 U.S. 1129, 101 S.Ct. 951, 67 L.Ed.2d 117 (1981) and cases cited therein.

*Lynott v. Henderson*, 610 F.2d 340, 342–43 (5th Cir.1980) merely jumped from the idea of no constitutional right to the application of the *Pell* balance.

Another court assumed without holding "that such a right exists" and proceeded to find that the restrictions in question met the *Pell* test. *Ramos v. Lamm*, 639 F.2d 559, 578 (10th Cir. 1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

erence" in implementing correctional goals. *Bell, supra,* 441 U.S. at 521, 99 S.Ct. at 1865.

In *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), the court ruled that a regulation restricting visitors to family members unless the prisoner had no family in the state was a legitimate security regulation. The court explained that the regulation allowed visits

> with those individuals whom prison officials believe are most likely to aid in their rehabilitation, while keeping visitations at a manageable level that will not jeopardize institutional security. Those prisoners who have immediate family in Colorado may still communicate with non-family friends by using the mails or by communicating to these individuals through the family members and attorneys who are permitted to visit them. So long as these alternative channels of communication are open to prison inmates, we think that the numerical and qualitative restrictions on inmates' visitors are not unreasonable.

*Id.* at 581. *See also Wilson v. Nevada Dept. of Prisons,* 511 F.Supp. 750 (D.Nev. 1981) (upholding a visitation restriction on a death row inmate that limited his visitors to family members and two nonfamily members).

■ This court finds the analysis in *Ramos* applicable here. In addition to the reasons given in *Ramos,* restrictions on the number of visitors enable prison officials to maintain the orderly administration of jails. Officials must draw a line allowing prisoners some visitation, but restricting it to a manageable amount. Although allowing Mr. Smith two or three nonfamily visits would not create a "grand central station" tide of visitors as the defendants have suggested, this court finds that the restriction to family members is reasonably related to a legitimate goal of proper prison administration.[10]

[8] The *Pell* standard also applies to the challenged regulation banning Mr. Smith from participation in group religious services with other inmates. Defendants have defended this regulation by citing security problems. These regulations are rationally related to the cited security concerns, which are legitimate, and which are discussed more fully *infra,* section E, in determining the merit of the plaintiff's claims of an equal protection violation.

**D. Sixth Amendment Claims**

Plaintiff supports his sixth amendment claim by asserting: first, a general right of access to courts for appeal forbids the state from subjecting him to conditions of incarceration prior to his execution that will weaken his will to live and thus in effect force him to "voluntarily" surrender his right of appeal, and second, the ban on visits by paralegals and those similarly situated working for his counsel denies him effective assistance of counsel.

■ "It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). The court does not find Mr. Smith is being denied access to the courts. There is no evidentiary basis for finding that his will is being broken. There is no evidentiary basis that he is in imminent danger of voluntarily surrendering his right of access to the courts.

The plaintiff's expert, Dr. Rodriguez, a psychiatrist who has been treating Mr. Smith for nearly two years, testified about Mr. Smith's mental condition. Dr. Rodriguez testified about a session with Mr. Smith on June 23, 1983, two weeks after Mr. Smith's transfer to the UCP. Reading from his notes taken at the time of the session, Dr. Rodriguez testified, "There has been a better outlook at that time of his own life. He was more alert, was interested in fighting for his rights and for his life, and some medication was pre-

---

**10.** Although some courts have rejected the family/nonfamily distinction, others have recognized the primary importance of family members in the emotional health of an inmate. *McMurry, supra,* 533 F.Supp. at 764.

scribed." [11] Tr. 266. A week later, on June 30, 1983, Mr. Smith appeared depressed, but by July 14, 1983, Dr. Rodriguez testified, reading in part from his notes, "[a]t that time he [Smith] looked in a better outlook from previous week. Was alert and interested in himself." Tr. 270. On cross examination the defendants asked the following: "So in terms of the objective diagnosis that you have made, he [Smith] is suffering from the same thing he has been suffering from for the last two years, just the complaints are different?" Dr. Rodriguez answered, "Yes." The defendants then asked, "And he [Smith] is not suffering from a major disorder. He is suffering from anxiety?" Dr. Rodriguez answered, "Yes." Tr. 276.

Mr. Smith testified at the hearing. He understood the proceedings and testified cogently and coherently. He evidenced a determination to fight his conviction. The court's observations of Mr. Smith's demeanor and evaluation of his testimony are in accord with Dr. Rodriguez's expert testimony to the effect that plaintiff's desire to reverse his conviction and his mental ability to pursue that goal have not diminished.

 Plaintiff's second point under his sixth amendment claim is that the defendants' ban on his visiting with paralegals, law students and legal investigators denies his right of access to the courts. The Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 419–21, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974), held that a prisoner's right of access to the courts requires not only that he be allowed to visit with his attorneys, but also paralegals, law students and legal investigators assisting his counsel. This serves to reduce the expenses of a prisoner's litigation.

11. Dr. Rodriguez's testimony is not in complete sentences because he was in part reading from his notes and in part stating his recollection at the time of the hearing.

12. Mr. Smith is an example of why this finding is valid. While on a "model inmate block" and having every privilege allowed to an inmate, Mr. Smith murdered a female correction officer, mutilated her body, and left it in a garbage dump. Tr. 386. When he was 17 years old, Mr.

Mr. Smith will be allowed access to legal assistants who are in fact assisting Mr. Smith's attorneys and who are working on his case, and the defendants may make appropriate regulations governing these visits consistent with reasonable security measures, including, but not limited to, a ban on contact visits by any nonlawyer.

New York Correction Law § 650 allows visits with "counsel." "It is well settled that this Court will not pass on the constitutionality of an Act of Congress if a construction of the statute is possible by which the question may be avoided." *United States v. Clark*, 445 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980), and cases cited therein. Hence, to the extent that defendants have interpreted § 650 to require the ban on visits by paralegals employed by plaintiff's lawyers, they must revise that interpretation to construe "counsel" to include legal assistants working for plaintiff's attorneys.

### E. Equal Protection Claim

 Plaintiff claims he is being denied equal protection of the laws since his incarceration is significantly more onerous than that of other inmates incarcerated for murder and other crimes of violence. Equal protection rights do survive incarceration. *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

A conviction of the crime of killing a prison guard while incarcerated justifies the security precautions taken at the UCP. A prisoner who kills a security guard is per se a maximum security risk. [12] Insofar as § 650 requires the incarceration in the UCP of such a prisoner, it is rationally related to

Smith was convicted of armed robbery and sentenced to 20 years of which he served 10. In 1976, Mr. Smith was convicted of two brutal murders: He choked a woman to death, and he killed a man by slashing his throat. Mr. Smith was serving two 25 years to life sentences when he committed the murder of the prison guard for which he is currently sentenced to death. Tr. 105–06.

a legitimate prison objective and thus is not unconstitutionally discriminatory.[13]

■ The attack on the constitutionality of a prison administration regulation or statute should be rejected unless the statute or regulation is unnecessary for any legitimate penological objective. *Bell, supra,* 441 U.S. at 547, 99 S.Ct. at 1878 ("Even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security."). Under equal protection analysis, defendants need only show "a rational basis for their distinctions," *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629 (1977), though distinctions based on invidious discrimination might fall into a different analysis even within prisons, *Lee, supra,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212.

■ The court finds that the distinction made by § 650 is rationally related to legitimate prison goals and does not violate Mr. Smith's right to equal protection of the laws.

## F. Due Process Claim

Plaintiff contends that he has a liberty interest in the various comforts of incarceration that have been denied to him, that the deprivation of this liberty interest cannot be done by the state without due process, that he received no such due process and that therefore his confinement in the UCP is unconstitutional.

For plaintiff to show that he has been deprived of his due process rights under the fourteenth amendment he must show that he has been deprived of a liberty interest in being housed with the general prison population even after his sentence. Two sources exist for the grant of such a liberty interest, state law and the due process clause of the constitution itself. *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 869, 74 L.Ed.2d 675, 685 (1983). Defendants contend that they are following their construction of N.Y. Correction Law § 650. As discussed *supra,* the defendants' construction of § 650 is not unreasonable, and hence the plaintiff, having been sentenced to death, has no entitlement according to New York State law to be incarcerated with the general population. The *Hewitt* Court held that the due process clause does not create any such liberty interest. Justice Rehnquist wrote,

Respondent argues, rather weakly, that the Due Process clause implicitly creates an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters. While there is little question on the record before us that respondent's confinement added to the restraints on his freedom, we think his argument seeks to draw from the Due Process Clause more than it can provide.

---

13. New York, in fact, waits until the death sentence is issued before transferring a prisoner to the UCP. The fact that New York waits a short period after the justification for incarceration in the UCP arises, is immaterial to the outcome here. A fair trial resulting in a conviction of guilt for murdering a correction officer while incarcerated justifies treatment that is different from what other inmates receive. This court should not reach unnecessary constitutional issues. *See generally Barrows v. Jackson,* 346 U.S. 249, 254–56, 73 S.Ct. 1031, 1033–1035, 97 L.Ed. 1586 (1953).

Defendants have offered two expert opinions to support the general contention that a prisoner condemned to death becomes a desperate man and a uniquely heightened security risks. Plaintiff offered testimony that indicated a

death sentence does not make convicted criminals more dangerous than before sentencing due to the long period of appeal that usually follows such a conviction. *See* testimony of Professor Jackson, tr. 122–143 and testimony of former superintendent Kamka, tr. 144–180, who related personal, expert experience with Maryland's death row inmates, who were housed in the .general prison population without creating unusual security problems. Nonetheless, testimony of New York's Deputy Commissioner of Corrections, Arthur Leonardo, indicated other reasons why an inmate sentenced to death might present a heightened security risk. A prisoner sentenced to death might be a target of another prisoner seeking to prove his mettle, or might become depressed and suicidal. Tr. 287–91.

*Hewitt, supra,* —— U.S. at ——, 103 S.Ct. at 869, 74 L.Ed. at 685 (footnote omitted).

▮ Plaintiff has not lost any protected interest in his transfer to the UCP, and the state therefore owed him no due process hearing prior to or after the transfer.

## G. Consent Decree Claim

▮ Plaintiff's argument based upon the holding in *Kozlowski v. Coughlin,* 539 F.Supp. 852 (S.D.N.Y.1982), rejecting a New York State regulation on visitation as a deprivation of liberty without due process, and the subsequent consent settlement of that suit is without merit. The holding in *Kozlowski* was predicated on the existence of a state-created liberty interest in visitation. *Kozlowski, supra,* 539 F.Supp. at 555–57. Prisoners incarcerated in the UCP under § 650 clearly do not have that same liberty interest as other prisoners, and thus were not covered by the ruling in *Kozlowski* or the subsequent consent decree.

## CONCLUSION

The defendants are ordered to allow the plaintiff to visit with legal assistants who are working on plaintiff's case for attorneys representing the plaintiff. The defendants may devise regulations to govern these visits, including but not limited to a ban on contact visits. The plaintiff's application for relief is denied in all other respects. The foregoing shall constitute the findings of fact and conclusions of law of this court in this case.

SO ORDERED.