**Ada ROBINSON and Albert Robinson, Plaintiffs,**

v.

**James F. PALMER, et al., Defendants.**

**Civ. A. No. 85–1044.**

United States District Court, District of Columbia.

Aug. 8, 1985.

Jeffrey F. Lawrence, Michael G. Roberts, Billig, Sher & Jones, P.C., Washington, D.C., for plaintiffs; Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Union Fund of the Nat. Capitol Area, Washington, D.C., of counsel.

Beverly A. Lewis, Asst. Corp. Counsel, Dept. of Corrections, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding the wife of a prisoner, and the prisoner who is confined to a District of Columbia penal institution, challenge a decision of the Director, District of Columbia Department of Corrections ("Department") suspending the wife's visiting rights for one year and later permanently suspending those rights. The plaintiffs Ada Robinson and her husband Albert Robinson seek to overturn the actions of the Department's Director. They request injunctive and declaratory relief as well as

damages under 42 U.S.C. § 1983. The defendants are the Director and two officials of the Department, the Mayor of the District of Columbia and the District of Columbia.

The matter is before the Court on cross motions for summary judgment and plaintiffs' application for a preliminary injunction. The matter was fully briefed and following argument on the motions, post hearing memoranda were submitted by the parties. For the reasons set out below the Court determines that Mrs. Robinson is entitled to procedural due process, through a hearing, before the suspension of her visiting rights was increased from a one-year to a permanent suspension.

## BACKGROUND

The material and essential facts in this case are uncontroverted. Mr. Robinson is currently incarcerated in a Department facility located in Lorton, Virginia ("Lorton") following a felony conviction and sentence. On March 8, 1983 while visiting her husband, Mrs. Robinson attempted to bring contraband into that facility. The contraband, a quantity of marijuana, was found in a plastic lunch bag secreted in her undergarments.[1] Because of this infraction, Mrs. Robinson was advised in a letter dated March 8, 1983 from Salanda Whitfield, a Department official, that her visiting privileges were suspended for one year.[2]

> This is to advise you that your visiting privileges at all ... Department of Corrections Facilities have been suspended

for a period of one year. This action is taken as a result of visiting regulations governing visitor conduct (Introduction of Contraband) during a visit to the institution on March 8, 1983.

> You may apply in writing for reinstatement of your visiting privileges after March 8, 1984. If you have any questions regarding this matter, please contact this office ... at phone 727–4000, x–483.

The one-year suspension sanction was based on a Department contraband policy directive, effective June 28, 1978, which provided that "[I]legal or administrative sanctions are exercised against those who either attempt to introduce or are in possession of contraband."[3] On February 15, 1983, the Acting Director of the Department in reaffirming the contraband policy stated in a memorandum to his assistants, that "citizens *permanently banned* from further visitation privileges may continue to appeal such action to my office."[4] On February 6, 1984, one month before the end of Mrs. Robinson's one-year suspension, the Department amended the June 28, 1978 policy directive to provide that

> Any visitor who introduces contraband or attempts to introduce contraband into a Department of Corrections Institution will be *permanently suspended* from all Department of Corrections Facilities.[5] (emphasis added).

The plaintiffs challenge the February 6, 1984 change in the contraband policy. They allege various constitutional viola-

---

**1.** Defendants' motion to dismiss complaint or alternatively for summary judgment at Ex. D.

On March 25, 1983, Mrs. Robinson was also charged with trying to enter Lorton under an assumed name after her visiting privileges had been suspended. Defendants' Motion for Summary Judgment at Exhibit F. Although defendants presented at the oral argument a letter, dated March 31, 1983, addressed to Mrs. Robinson stating that she would receive an indefinite suspension based on that attempt, it has been the consistent position of the defendants that Mrs. Robinson's permanent suspension is based on the contraband policy. *See, e.g.,* Compl. at Exhibits 5, 6.

**2.** Compl. at Ex. 1.

**3.** Department Service Order No. 5010.3B, ¶ 5(e), June 28, 1978, Defendants' Post-Hearing Memorandum at Ex. G.

**4.** Defendants' motion to dismiss complaint or alternatively for summary judgment at Ex. A. (emphasis added).

**5.** Compl. at Ex. 3, Department Service Order No. 5010.3B, Change Transmittal 1, ¶ 2, February 6, 1984. That Change Transmittal was soon replaced by a new contraband policy, Service Order No. 5010.3C, effective May 4, 1984, which incorporated the permanent suspension policy. *See* Compl. at Ex. 4.

tions and also claim that the policy was adopted in violation of the District of Columbia Administrative Procedure Act ("APA").

■ At the outset, the Court notes that the Robinsons' complaint fails to assert any cognizable claim against either the District of Columbia or the Mayor under 42 U.S.C. § 1983. *Oklahoma City v. Tuttle,* — U.S. —, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. New York City Dept. of Social Service,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Nor are there any claims or allegations that either was even remotely involved in the underlying facts of this litigation. Accordingly, those defendants are *sua sponte* dismissed by the Court.

## ANALYSIS

### The Constitutional Claims

### A. First Amendment

Plaintiffs claim that the contraband regulation infringes upon their first amendment right to visitation. "[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). *See also Procunier v. Martinez,* 416 U.S. 396, 422, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974) (Marshall, J., concurring) ("A prisoner does not shed such basic First Amendment rights at the prison gate").

However, it is not clearly established that prisoners do have a constitutional right to visitation. "When confronted with the question whether inmates have a constitutional right to receive visits from family and friends, courts have reached varying results." *Ramos v. Lamm,* 639 F.2d 559, 579 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). *See also Martin v. Wainwright,* 525 F.2d 983, 984 n. 3 (5th Cir.1976) (per curiam); *White v. Keller,* 438 F.Supp. 110, 114–15 (D.Md.1977), *aff'd,* 588 F.2d 913 (4th Cir. 1978). The question here is not whether an inmate has a constitutional right to visita-

tion, *per se,* but whether prison officials may limit that right. In this case, prison officials seek to impose a limitation on visitors caught entering the facility with contraband.

■ Assuming *arguendo* that plaintiffs do have a constitutional right to visitation founded in the first amendment, the governmental restriction on that right must be closely scrutinized. "[C]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (analyzing constitutional interests involving face-to-face interviews between prisoners and the media). *See also Procunier v. Martinez,* 416 U.S. at 409, 94 S.Ct. at 1809 (analyzing constitutional interests involved with censorship of inmates' mail).

In evaluating the restriction on prisoner visitation through a contraband policy, the Court must determine whether it "is reasonably related to legitimate governmental objectives." *Block v. Rutherford,* — U.S. —, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). It cannot be disputed that there is a legitimate governmental objective in deterring visitors from bringing contraband into the prison. "Prison officials stressed the enormous security risk flowing from the introduction of contraband into the prison population...." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1032 (2d Cir. 1985). In such cases where the activity being regulated, in this case, contraband, is presumptively dangerous, there is a "burden upon prisoners to demonstrate that the restriction is not supported by a reasonable justification." *Id.* at 1033.

■ Plaintiffs do not challenge the fact that Mrs. Robinson is appropriately a subject of sanctions for carrying contraband into Lorton. What they do challenge, however, is the reasonableness of a permanent suspension of visiting privileges. Be-

cause of the security objectives behind the contraband policy and the dangers posed by the introduction of contraband into Lorton, the Court cannot conclude that it is unreasonable for prison officials to adopt a permanent suspension policy.[6] "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547, 99 S.Ct. at 1878. There are legitimate security objectives supporting the contraband policy, and the Court should defer to the reasonable judgment of prison officials as to the details of the policy. *Cf. Rutherford*, 104 S.Ct. at 3234 ("When the District Court found that many factors counseled against contact visits, its inquiry should have ended. The court's further 'balancing' resulting in an impermissible substitution of its view on the proper administration of Central Jail for that of the experienced administrators of that facility"). *See also Blocker v. District of Columbia*, C.A. No. 85–0527, Mem. at 2 (D.D.C. June 6, 1985).

■ Moreover, Mrs. Robinson has other means of communicating with her husband beyond visits. Given the alternate channels available, the limitation posed by the policy is not an unconstitutional infringement on first amendment rights. *Pell v. Procunier*, 417 U.S. at 827, 94 S.Ct. at 2806. Other restrictions on inmate visitation regulations have similarly been upheld by courts. *See, e.g., Ramos*, 639 F.2d at 580–81; *Morrison v. Lefevre*, 592 F.Supp. 1052, 1079 (S.D.N.Y.1984) ("It is reasonable for a prison to deny visiting privileges to

someone who is suspected of having attempted to aid a prisoner's escape."); *Smith v. Coughlin*, 577 F.Supp. 1055, 1061–62 (S.D.N.Y.1983), *aff'd*, 748 F.2d 783 (2d Cir.1984). Thus, the contraband policy, SO 5010.3C, is not a *prima facie* unconstitutional violation of plaintiffs' first amendment rights.

**B. Eighth Amendment**

■ The plaintiffs argue that Mrs. Robinson's permanent visitation suspension is tantamount to the imposition of "cruel and unusual punishment" for her husband, and thus violates the proscriptions of the eighth amendment. This argument is without merit. Given the fact that Mrs. Robinson's exclusion was not a condition of Mr. Robinson's confinement and that it resulted from her violation of the Department's contraband policy, the permanent suspension does not violate Mr. Robinson's eighth amendment rights. *Cf. Morrison*, 592 F.Supp. at 1079 ("The unreasonableness and the unconstitutionality of the deprivation in the instant case stems not from any cruel or unusual treatment in forbidding visits by a person accused of aiding inmate escapes").

**C. Fourteenth Amendment**

■ Mrs. Robinson asserts in her affidavit filed in support of the motion for summary judgment, that she was not afforded any type of hearing prior to the imposition of her suspension. Prisoners retain rights under the due process clause which are not inconsistent with the nature of their confinement. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). The plaintiffs argue

---

**6.** Since the contraband policy is facially neutral regarding suspension of family members vis-a-vis non-family members, *see* Compl. at Exhibit 4, the Court does not view the policy as implicating constitutionally protected family rights. This is not a case where certain family members are banned from visitation, *see, e.g., Valentine v. Englehardt*, 474 F.Supp. 294, 301 (D.N.J.1979) (children banned from visiting inmates), or where the regulation is directed towards certain family members, *see, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 498–99, 97 S.Ct. 1932, 1935–36, 52 L.Ed.2d 531 (1977) (ordinance di-

recting that certain categories of relatives may live together). Rather, although the suspended visitor in this case happens to be the wife of the prisoner, the Court will analyze her status in the fashion as does the contraband policy—as a visitor. *Cf. Keller*, 438 F.Supp. at 115 ("Although the named plaintiff visitors are the parents of the named inmates, they do not sue as parents *qua* parents but as parents *qua* visitors. Hence the question presented is that of the constitutional right to visitation generally and not that of the right to visits from family in particular").

that the lack of any procedures prior to the imposition of the suspension was a denial of their fourteenth amendment due process rights. They further assert that they have a protected liberty interest in visitation rights such that those rights cannot be removed without according them the requisite procedural due process. "Liberty interests protected by the Fourteenth Amendment may arise from two sources— the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Plaintiffs cannot claim that a constitutional right to visitation gives rise to a protected liberty interest because "[c]onvicted prisoners have no absolute constitutional right to *unrestricted* visitation." *McMurry v. Phelps,* 533 F.Supp. 742, 764 (W.D.La.1982) (emphasis added). *See also Keller,* 438 F.Supp. at 114 (no constitutional right to unrestricted visitation). Since the regulation at issue involves a reasonable restriction on any constitutional right to visitation, plaintiffs cannot rely on a constitutional right as the basis for their liberty interest in visitation.

■ Moreover, plaintiffs cannot rely on a state created liberty interest in the form of a statute which gives inmates a mandatory right to visitation. *See Kozlowski v. Coughlin,* 539 F.Supp. 852, 856 (S.D.N.Y. 1982) ("The State of New York, by judicial decision, administrative regulation and departmental directive has granted its prisoners a protected liberty interest in receiving visits from persons of their choice"). *Cf. Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871–72 (mandatory nature of Pennsylvania statute regarding administrative segregation). The Court cannot find, nor can plaintiffs point to, a provision of the District of Columbia Code relating to mandatory rights of visitation.

## 1.

■ However, a liberty interest may be created by a state regulation. "[A] prisoner may acquire a protected liberty interest by virtue of official policy statements or regulation duly promulgated by administrators of the particular institution at which the prisoner is confined." *Lucas v. Hodges,* 730 F.2d 1493, 1504 (D.C.Cir.1984), *vacated as moot,* 738 F.2d 1392 (D.C.Cir. 1984). This may be the case when "a State creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). *Accord Lucas* at 1505.

■ The Department of Correction's contraband policies in existence, both at the time of the suspension, and at the time the suspension was increased,[7] does not contain any language which limits official discretion with respect to the suspension or which "set[s] out explicit substantive criteria on which the decisionmaker must base the *imposition of restrictions or the withholding of benefits.*" *Id.* Thus, Mrs. Robinson need not have been provided a hearing prior to the invocation of the policy. Further, an examination of the Lorton Visitation Policy[8] reveals that there are no restrictions on discretion concerning suspension of visitors for cause, including introduction of contraband.

However, even if the visitation policy can be read to provide Mr. Robinson with a liberty interest in such privileges, his entitlement to a hearing in this matter is questionable. Aside from the fact that Mrs. Robinson visited her husband at the Lorton facility, there is no allegation that he was in any way involved in the contraband incident. The Department's letter suspending his wife's visitation privileges did not charge him with illegal conduct and the record does not disclose that any charges were ever placed against him. He joined his wife as a co-plaintiff in this proceeding and we assume that his claim is based upon an expectation of visitation privileges from his wife which have been

**7.** Defendants' post-hearing memorandum at Ex. G; Complaint at Exs. 3 and 4.

**8.** The Court requested the defendants to furnish it with the policy. It is attached hereto as Exhibit 1.

permanently suspended without a hearing. From the facts presented in this case, the Court is not prepared to hold that a prisoner is entitled to a hearing when he is not immediately implicated in an incident and where no disciplinary measures are assessed directly against him. *Cf. Blocker, supra,* Mem. at 3–4 (D.D.C. June 6, 1985).

**2.**

■ The Court concludes that Mrs. Robinson has a protected liberty interest in only a one-year suspension in her visiting privileges as provided in the Department's March 8, 1983 letter from Salanda Whitfield. While the defendants contended at the oral hearing on the summary judgment cross motion, that a February 15, 1983 memorandum from the Department Director to his assistants referred to a permanent suspension of visiting privileges for contraband violations, it is clear that that memorandum was never written, published or circulated as a Department Order or Service Order as customarily done by the Department with respect to its contraband policy. The Whitfield letter of March 8, 1983, gave Mrs. Robinson a protected interest and expectation that suspension of her visitation privileges would be limited to one year. That suspension could not be permanently extended without notice and without affording her an opportunity to be heard.

■ In the absence of prior notice and a hearing, the Department's decision was arbitrary, excessive and Mrs. Robinson is entitled to relief. This is not to say that anything approaching a formal adversarial hearing is required, however, minimal due process requirements should be provided. *See Kozlowski,* 539 F.Supp. at 858. Mr. Robinson may appear and participate, but under the facts of this case, his appearance and participation are not considered to be as "of right."

### DISTRICT OF COLUMBIA ADMINIS-TRATIVE PROCEDURE ACT

As a further argument, the plaintiffs contend that the 1984 contraband policy was adopted in violation of the District of Columbia APA, D.C.Code § 1–1501 *et seq.*

(1981), and the rulemaking provisions of that statute. Section 1–1502(6) provided in pertinent part

The term 'rule' means the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Mayor or of any agency.

Counsel for the government argued to the contrary and responded to a question put by the Court at the oral argument that the Department had never observed the APA rulemaking procedures in promulgating its directives either on the contraband policy or with respect to visitation privileges. Of course what the Department has done in the past is not necessarily controlling.

The Court will defer ruling on the applicability of the APA pending the receipt from government counsel of a memorandum identifying all formal rulemaking undertaken by the Department since 1980. The memorandum shall present a full explanation and statement of reasons why rulemaking was pursued as to each rule identified.

### THE QUESTION OF DAMAGES

■ The Court views this proceeding as basically a challenge to lack of procedural due process. In their § 1983 claim, plaintiffs seek damages as well as equitable relief. There is no quarrel with their request for injunctive relief. The question of damages, however, presents a serious problem. The weight of authority as to damages suggests that for denial of procedural due process, the plaintiffs are entitled only to nominal damages absent a showing of actual injury resulting from denial of *procedural* rights. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In that case, brought under 42 U.S.C. § 1983, the Supreme Court considered the elements and prerequisites for the allowance of damages by students suspended

from public schools for violation of a rule for use of drugs. The school imposed a 20-day suspension for violation of that rule. Thereafter, a suit was filed under § 1983 charging that the students had been suspended without due process of law in violation of the Fourteenth Amendment. Declaratory and injunctive relief were sought together with actual and punitive damages in the amount of $3,000. A unanimous Supreme Court observed[9] that under § 1983, the

> rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law.

*Id.* at 259, 98 S.Ct. at 1050. The Court then held that

> Even if respondents' suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process. 'It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing....' (citations omitted)
>
> Common-law courts traditionally have vindicated deprivation of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making

the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivation of rights.

> Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, see *Boddie v. Connecticut,* 401 U.S. 371, 375 [91 S.Ct. 780, 784, 28 L.Ed.2d 113] (1971); *Anti-Fascist Committee v. McGrath,* 341 U.S. [123] at 171–72 [71 S.Ct. 624, 648–49, 95 L.Ed. 817] (Frankfurter, J., concurring), we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury. We therefore hold that if upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages not to exceed one dollar from petitioners. (footnotes omitted).

*Id.* at 266–67, 98 S.Ct. at 1053–54. Therefore, the Court, *sua sponte,* grants nominal damages.

EXHIBIT 1

| DIVISION<br>Operations<br>Procedures | _1_ of _1_ | 9/7/78 | 4500.7B |
|---|---|---|---|
| | Subject:<br>Visitors Policies and Procedures<br>(Appearance and Attire) | | |
| Service: Correctional Services<br>Division: Central Facility | Authority:<br>S.O. 4500.7B | Signature of Administrator<br>/s/ Salanda V. Whitfield | |

1. <u>Purpose</u>. To establish general guidelines relative to the appearance and attire of all visitors to the D.C. Department of Corrections Central Facility.

---

**9.** Justice Marshall concurred in the result and Justice Blackmun did not participate in any manner.

2. Issuances.

    a. Cancellations: None

    b. References: S.O. 4500.7B

3. Policy. The general policy of the D.C. Department of Corrections Central Facility, is to permit as much individuality in dress and appearance of visitors as is consistent with good judgement and institutional security requirements.

4. Delegation of Authority. The Administrator is delegated authority to prescribe clothing worn by visitors to the Central Facility. This authority will not be further delegated.

5. Procedure. All visitors to the Central Facility are to be dressed in accordance with the moderate prevailing standards of the fashion world.

    a. All visitors must wear shoes or will not be permitted to enter the institution.

    b. Males. must wear shirts. Females are allowed to wear halter tops; however, the midriff must be covered.

    c. Shorts above the mid thigh are not permissible and visitors will not be allowed to enter the institution wearing shorts as described.

    d. Hats and other forms of head dress may be worn; however, the same are subject to search.

    e. Effective Date. Upon receipt.

Distribution: A & C

| DIVISION<br>Operations<br>Procedures | Page Number:<br>_1_ of _1_ | Date:<br>June 5, 1981 | Subject Code:<br>4500.1 |
|---|---|---|---|
| | Subject:<br>Visiting Hours | | |
| Service: Correctional Services<br>Division: Central Facility | Authority: | Signature of Administrator<br>/s/ Salanda V. Whitfield | |

1. Purpose: The purpose of this order is to establish visiting hours at Central Facility that are compatible with other scheduled activities and programs.

2. Issuances affected or referenced: S.O. 4500.7C

3. Procedures:

    a. Normal visiting hours at Central Facility will be as listed below. The Visiting Hall will be cleared of all visitors no later than one hour after close of visiting.

        Monday—Friday: 6:00 P.M. to 9:00 P.M.

        Saturday: 8:00 A.M. to 12:00 Noon

        Sunday: 8:00 A.M. to 1:00 P.M.

        Holidays: 8:00 A.M. to 12:00 Noon

    b. Attendance of visitors at programs and special activities will be in accordance with times specified in approved MAT's.

4. This order is effective June 8, 1981.

DEPARTMENT OF CORRECTIONS
CORRECTIONAL COMPLEX
LORTON, VIRGINIA

SO 4500.7C

May 15, 1970

SUPERINTENDENT'S ORDER 4500.7C

Subject: Visiting Policies and Procedures at the Central Facility and Adjustment Unit

1. <u>Purpose</u>. The purpose of this order is to advise staff and residents of changes in visiting policies and procedures.

2. <u>Cancellation</u>. This order supersedes and cancels Superintendent's Order 4500.7B CH 1, dated October 1, 1968, which may be removed from the files.

3. <u>Action</u>.

   a. <u>Visitors</u>

   (1) Each resident shall have a list of authorized visitors containing only persons that appear to be sincerely interested in the resident's welfare. The authorized list may include immediate relatives and friends; however, because of the necessity for limiting the number of visitors per visiting period that are permitted to visit, the number of friends authorized to visit will be limited. This means that under normal circumstances unmarried residents will be authorized to have a girlfriend on their visiting list. Visiting privileges for other friends, male or female, will be extraordinary, and worked out between the resident and his caseworker. When immediate relatives show that they are not very interested in visiting, the resident may work out a plan with the caseworker for other relatives or friends to visit. Immediate relatives, for example, are parents, siblings, children, grandparents, foster parents, guardians, wife or common-law wife. Immediate relatives may request that their spouse be authorized to visit, and in situations such as this, in-laws may be authorized to accompany the relative for visits.

   (2) The Chief of Classification and Release Programs is responsible for the implementation of the visiting policies. In this connection, each visitor will be required to furnish certain pertinent information before he is authorized to visit. Included will be identification photographs which will be provided free of charge. Visitors who object to being photographed by institutional staff will be required to furnish two photographs for use as personal identification before receiving permission to visit.

   b. <u>Visiting Procedure</u>

   (1) The Associate Superintendent of Custodial Operations is responsible for the administration of the visiting procedures. One officer (hereafter referred to as the Visiting Room Officer) will be required to supervise the visiting procedures in each visiting facility, except when visiting on the lawn without direct supervision is authorized. The Associate Superintendent may detail supplemental staff to this program as needed. One officer will be required to work with the Visiting Room Officer, and perform duties including the supervision of clearance procedures, checking in visitors, shakedown duties, etc.

   (2) Visiting will be extended throughout the week and include at least two evenings a week. Visiting during the day may commence at 8:00 A.M. and end prior to the afternoon count. Evening visits may commence immediately following the afternoon count. Evening visits should end approximately thirty minutes before it gets dark.

   (3) Visiting on Saturday and Sunday, including the Fifth Sunday, will be held for one hour only from 8:00 A.M. until 2:30 P.M. on Sunday, and from 8:00 A.M. until 12:30 P.M. on Saturday. Visiting in the Adjustment Unit will not be changed.

(4) The number of visitors in the Visiting Room will be limited to the number of chairs and tables that are available. When the room is filled, the visitor must wait until space is available.

c. Visiting Conditions

(1) Visitors are required to keep children as orderly as possible in order that other visits will not be disturbed.

(2) Lasciviousness (exhibitionism and sexual play) will not be permitted. Visitors will be permitted to express affection at the beginning and end of the visiting period. Flagrant abuses in this connection will be subjects for discipline. These desires are understood, but we are not equipped for the authorization of this kind of intimate contact.

(3) Four types of visiting conditions will be in operaton at the Lorton Complex. As mentioned above, visiting at the Adjustment Unit will not be changed. At the Central Facility, visiting conditions will be as follows. 1. In connection with the honor system, some men will be permitted to visit, weather permitting, on the lawn. 2. Regular visiting will be held in the Main Visiting Room. 3. We will also mention a close custody visiting room for those who will be penalized, from time to time, for abusing visiting privileges.

(4) Each resident will be allowed to have ten hours of visiting time per month to be prorated among all of his visitors. No limits will be placed on the number of approved visitors that may visit a resident in concert other than occasions when it will be necessary to limit the number because of crowded visiting conditions. A resident may have only one visit a day. Residents may visit up to four hours on weekdays. Although visitors might remain for less than an hour on weekdays, the resident will be charged one hour for each fraction of a hour's visiting time.

(5) Visitors are urged to refrain from bringing large pocketbooks into the Visiting Room. In this connection, occasionally, we will request that visitors leave their pocketbooks in their automobiles, and we may provide lockers for them to use to secure pocketbooks.

(6) Food and beverage machines will be provided for the visitors to purchase snacks if they desire to do so when they are involved in an extended visiting period.

(7) Visitors who desire to leave funds for residents may do so by giving the money to the Visiting Room Officer who will give them a receipt for the deposits. Large sums of money for deposit into a resident's account is discouraged. The Visiting Room Officer is instructed to contact the caseworker who will confer with visitors who desire to leave more than fifty dollars for deposit in a resident's account.

(8) The objective of these visiting policies and procedures are to improve the visiting program and cope with the problems in connection with the introduction of contraband through the visiting process. Residents should assume some responsibility in creating an appropriate atmosphere and decorum during visits.

(9) A resident may bring with him on a visit only his comb, handkerchief, locker key, and canteen book. All other items will be confiscated.

4. <u>Effective Date.</u>  On or about May 15, 1970.

/s/ John O. Boone
John O. Boone
Superintendent

jap

DISTRIBUTION: "A", "B", "C", "D" & "E"